[687 NYS2d 319]

MARIE MITCHELL et al., on Behalf of Themselves and All Others Similarly Situated, Respondents, v LILLIAM BARRIOS-PAOLI, as Commissioner of the New York City Human Resources Administration, et al., Appellants.

First Department, March 23, 1999

## APPEARANCES OF COUNSEL

*Elisabeth Benjamin* of counsel, New York City (*Katie Kelleher, Steven Godeski, Richard Blum* and *Eva Landeo* on the brief; *Helaine Barnett, Steven Banks, Legal Aid Society; Janet Sabel, Emma Hunt, Scott Rosenberg; Marshall Green,* and *Colin Bull*, attorneys), for respondents.

*Alan G. Krams* of counsel, New York City (*Marilyn Richter, Kristin M. Helmers* and *Martha Mann Alfaro* on the brief; *Michael D. Hess, Corporation Counsel* of New York City, attorney), for municipal appellant.

*Lyssa M. Sampson* of counsel, New York City (*Thomas D. Hughes* on the brief; *Dennis C. Vacco, Attorney-General* of the State of New York, attorney), for State appellant.

**OPINION OF THE COURT**

ROSENBERGER, J. P.

The instant class action was brought by public assistance recipients who have been classified as "employable with limitations" (E-II) due to medical problems and who have been assigned to the City's mandatory Work Experience Program (WEP) as a condition of receiving benefits. Plaintiffs allege that the City habitually assigns E-II WEP participants to job assignments incompatible with their disabilities, leading to the loss of benefits without due process. They additionally allege that the State fails to supervise the City's administration of WEP pursuant to the Social Services Law.

We find that plaintiffs raise serious fairness questions about WEP's implementation and may well have shown their entitlement to CPLR article 78 relief. However, we also find that the IAS Court's grant of class certification should be reversed as unnecessary in this context, portions of the injunction vacated as overbroad, and defendants' cross motion to convert plaintiffs' remaining grievances into individual article 78 proceedings granted.

In exchange for welfare benefits, the City requires aid recipients to perform WEP assignments with City, State or nonprofit agencies unless the recipients are exempted due to physical or mental disabilities (*see*, Social Services Law § 131 [5]; § 164). A recipient may not be assigned to a WEP job that exceeds her medical limitations (Social Services Law § 332-b [7]; § 335-b [5] [e]).

A recipient claiming disabilities is sent to the City's medical contractor, Health Services Systems (HSS), whose doctors examine her and classify her as E-I (employable), E-II (employable with limitations), E-III (temporarily disabled) or E-IV (permanently disabled). The City's position is that E-II persons should be expected to work but will be assigned to jobs compatible with their conditions, while E-III persons will be exempted for the duration of their disability and E-IV persons will be exempted.

Thus, there are two potential types of mismatch between a disabled participant and a WEP assignment. First, a participant may be mistakenly classed as E-II when she is actually E-III or E-IV, and be sent to work even though she is unable to do *any* work. Second, a participant may be properly classified as E-II, but be assigned to a *particular* WEP job that is incompatible with the physical limitations recognized by the

City's own examining doctors. Plaintiffs contend that the latter fate has befallen them and the class members they would represent.

Once a recipient's general employability classification is determined, she receives three notices from the City relating to her employability and work requirements, plus an Orientation Manual. The first form, the Employability Notice, states that the recipient has been found "employable" by City doctors. It emphasizes that the recipient must accept WEP assignments "when appropriate" or lose benefits. It describes how a recipient may request a conciliation hearing and a State administrative hearing "[i]f you believe that you should not be considered employable".

The Employability Notices received by plaintiffs do not specify that plaintiffs were found employable with limitations. Furthermore, the standard form omits two important facts. It does not mention the City's obligation to accommodate the recipient's medical needs. Nor does it disclose the recipient's right—*conceded* by the City in this action—to receive benefits without performing an allegedly unsuitable assignment while her challenge to it is pending (*see*, 18 NYCRR 358-3.6). In fact, the Employability Notice explicitly says that unless she requests a hearing on "employability" within 10 days of receiving the form, she must continue to perform the assignment.

The 10-day time limit makes some sense if the issue is overall inability to work, since presumably the participant has all the facts at the time she receives the notice: she is being asked to work but knows she is completely disabled. Yet where the issue is inability to perform a certain type of work, the relevant facts are not known to her until she arrives at the job site, because the City here insists that the participant may not claim a job is inappropriate until she receives the actual details of her assignment. Since by this time the 10-day period has usually expired, and this is the only grace period mentioned on the form, the form gives rise to the inference that benefits will *not* be continued pending a challenge to a particular job.

Named plaintiff Marie Mitchell's case highlights how the form's general reference to "employability" and its failure to mention any way to challenge specific assignments forces participants into a Catch-22. Along with her Employability Notice she received an Assignment Information Summary saying she had been detailed to do maintenance work, a job category she considered incompatible with her respiratory ailments. Apparently believing that "employability" referred both to her

general ability to work and her ability to do this type of work, she immediately requested a fair hearing before going to the job site, so that she would not miss the 10-day deadline and lose her benefits. However, at the hearing, the City said that her claims were not ripe for review because she had never given the agency the chance to assign her a specific assignment. Meanwhile, the State said that the only issue she could raise at this point was whether she was employable at all, a point she failed to establish because she had never meant to raise it in the first place.

The second notice sent to WEP participants is a summary of the HSS doctors' findings and employability classification, known as the Physician Assessment of Client Employability (PACE) report. The PACE documents the recipient's specific medical limitations that need to be accommodated in matching her with a WEP job. Such documentation may then be brought to the work site to enable a participant to decline an inappropriate assignment. Plaintiffs allege that they never received any summaries of the HSS medical findings and that they only received the Employability Notice and the Assignment Information Summary. Pursuant to an amendment to the Social Services Law effective November 1, 1997 (Social Services Law § 332-b), the City now sends WEP participants copies of their PACE forms, which apparently was not the practice beforehand. In any event, as the PACE is only a medical form, it says nothing about the participants' procedural rights.

The third notice is the Assignment Information Summary, which names the government agency where participants will be sent (e.g., the Parks Department) and the job category (e.g., maintenance work), but not the particular assignment they will receive. This notice does not always inform participants of their E-II status either. Named plaintiff Pearly Alli's notice said nothing about it, while class member Cytherea Iverson's notice contained a terse "Comment: Coded E-II by HSS 3/28/96. Asthma employable/limitations." Like the other documents furnished to WEP participants, this one only mentions the right to a hearing "[i]f you believe your employability status has changed", and states that meanwhile the participant must keep going to her work assignment until further notice.

Plaintiffs allege that because the Assignment Information Summary does not name the specific job a participant will be asked to do, they are deprived of the opportunity to raise a timely challenge to improper assignments. The City counters that such detailed notice could not be provided in advance

because the assignments are made at the sites in response to the day-by-day needs of the agencies.

The current Orientation Manual, revised in July 1997, contains many of the same flaws identified in the notices. (The earlier version of the Manual which was provided to these plaintiffs, though it uses slightly different language, conveys the same impressions and need not be discussed separately.) It instructs the participant that she has the right to contest her over-all employability status via the conciliation and fair hearing process, but does not say these remedies are available for challenges to particular assignments. The admonition that the objecting participant's medical documentation must "clearly state that you are *unable to work*" (emphasis in original) would mislead someone who believes she *is* able to work generally but unable to work at a specific job.

The City demands that objections to assignments on the grounds of disability should be raised first with the work site supervisors and coordinators and then with the Participant Services Unit (PSU). After that, the recipient may request a conciliation hearing with the City, and then an administrative hearing conducted by a State Administrative Law Judge (ALJ). The City and State represent to this Court that the judicial relief requested by plaintiffs is unnecessary because a participant is already guaranteed continuing aid throughout this grievance process even if she declines to perform the assignment (Social Services Law § 341 [2] [c]; 18 NYCRR 358-3.6). The City summarizes its contentions thus in its appellate brief: "The proper way to contest a WEP assignment as medically inappropriate is to report, learn what the assignment is, utilize the available mechanisms to try to work out any disagreements, and, ultimately, seek a fair hearing if the resolution is not satisfactory. During this process, the WEP participant will receive aid even if he or she refuses to do the work."

Defendants' representations fall short of reality. Evidently, though the above quote shows that the City is *capable* of stating a WEP participant's rights and responsibilities clearly and concisely, it has not done so in any of the materials it provides to the recipients themselves. While the Manual does tell them whom to contact initially about problems with specific jobs (the supervisor, the WEP field support staff, and failing that, the PSU), it does not say that they can request conciliation and fair hearings if the matters are not resolved at the PSU level.

The most egregious defect in the Manual and other notices is the failure to tell participants that their benefits will continue

while their challenges are pending even if they refuse to perform the allegedly unsuitable assignments. Quite the contrary information is offered. In the general section relating to penalties, the Manual says that participants must comply with their assignments while awaiting fair hearings. Simply inserting the quoted paragraph from the City's brief into the Employability Notice and the Orientation Manual would be a vast improvement in terms of due process.

The notices and Manual leave the over-all impression that a recipient must choose between trying to prove total unemployability, performing an improper assignment, or being threatened with loss of benefits. The message conveyed to participants is that pending any challenge to a work placement, they must continue to perform inappropriate assignments. Otherwise, they will be treated as having failed to comply and will receive conciliation notices. By this point it is too late to contact the PSU, because the PSU will not help clients who have failed to comply. Ironically, plaintiffs allege that when named plaintiff Gloria Jimenez and class member Vida Simon did attempt to perform their improper assignments because they feared losing benefits, their pre-existing disabilities worsened and forced them to miss work. The City then charged them with failure to comply and discontinued their benefits.

The long-standing deficiencies in the City's notice procedures were recognized by the City Council's Committee on Governmental Operations in July 1997. The Committee issued a report on WEP in conjunction with an oversight hearing into the death of a disabled WEP worker who had a heart attack while performing assigned sanitation duties that were incompatible with her documented medical history. Among the Committee's salient observations was the fact that the previous Manual (the one received by plaintiffs) and other notices do not inform WEP participants that conciliation hearings may be initiated by the *participant* to resolve work site grievances or protest inappropriate assignments. This flaw is still present in the revised Manual. Both the notices and the actual practice of Human Resources Administration (HRA) workers convey the message that the only way for a participant to obtain a hearing is to cease working and wait for the government to initiate a hearing demanding a reason for her noncompliance.

The Committee also found that PSU staff were telling aid recipients that PSU did not handle such grievances and that their only recourse was a fair hearing. The Committee's findings lend credibility to the stories of the plaintiffs. Virginia

Couverthier alleges that when she did show up at the work site and received an incompatible job, she was told to go home and wait for the City to send a letter demanding that she come in for a conciliation hearing to prove that her failure to comply was not willful. Pearly Alli also claims that she reported for a maintenance worker position that was beyond her capabilities as documented by the City, but the work site supervisors refused to review her doctor's report and sent her home to wait for a letter. Amalia Torres allegedly told her WEP supervisor that the maintenance work was too strenuous for her numerous disabilities, but the supervisor said he could do nothing about it. Performance of her assignment made her so ill she had to be hospitalized.

The unfairness of the inadequate notices was compounded by the behavior of the State Administrative Law Judges who conducted the administrative hearings of Mitchell, Jimenez and Simon (all of whom were *pro se*). The record shows that each of these ALJs conducted the proceedings as if the issue were the complainant's E-II designation, even though she was evidently challenging a particular type of assignment and requesting not an exemption from all work but merely a guarantee that she would be given appropriate work. The ALJs found that the complainants failed to prove a contention they had never meant to raise. In addition, though the State is responsible for ensuring that the City's WEP program accommodates persons with disabilities, the ALJ at Mitchell's hearing did not contradict the City's outright refusal to promise that Mitchell would be given an assignment consistent with her limitations. Overall, the combined actions of the City and State, rather than providing adequate notice and opportunity to be heard, effectively concealed from WEP participants the knowledge that they could refuse to perform the contested assignments, without losing benefits, while their challenges were pending.

This action was initially commenced in 1997 as an article 78 proceeding by Luz Santana, a disabled public assistance recipient whose benefits were discontinued for WEP noncompliance. The petition asserted that the City and State policies and practices described above violate the Federal Americans with Disabilities Act of 1990 ([ADA] 42 USC § 12101 *et seq.*), the State Social Services Law, and due process. Marie Mitchell was granted leave to intervene and assert the same theories, and the other named plaintiffs' article 78 petitions were consolidated with this case. (Santana's case was later severed because she left the jurisdiction after being awarded SSI.)

The first cause of action alleged that the City discriminates against disabled welfare recipients in violation of the Social Services Law by assigning them to WEP jobs that exceed their medical limitations. The second cause of action alleged that the Social Services Law is violated by the State's practices in conducting employability hearings before the ALJs, including the ALJs' failure to assist *pro se* petitioners in developing the record. The third cause of action alleged that defendants violate title II of the ADA (42 USC § 12132) by denying benefits to physically or mentally impaired persons without accommodating their known needs in WEP assignments, by retaliating against participants who challenge the suitability of their assignments, and by failing to provide them with notice of their rights and an adequate grievance mechanism. The fourth cause of action alleged that defendants' failure to give adequate notice of employability determinations and WEP assignments violates due process. The fifth cause of action alleged that due process is violated by the State's failure to supervise the City's administration of WEP and to help *pro se* class members protect their rights at their hearings. The sixth cause of action alleged that the State breached its duty to supervise the City's implementation of WEP. The seventh cause of action alleged that the ALJs' decisions at the named plaintiffs' hearings were arbitrary and capricious.

In the first order appealed from, entered May 1, 1998, the IAS Court granted plaintiffs' motion for a preliminary injunction and class certification. The court denied defendants' cross motion to dismiss the action or to transfer the matter to the Appellate Division as individual article 78 petitions pursuant to CPLR 7804 (g).

The court made a number of significant findings of fact. To the limited extent that the notices provided to WEP participants say anything at all about the participants' right to assignments consistent with their limitations, the notices indicate that participants must continue performing improper assignments or risk losing benefits while challenges are pending. Moreover, although the burden is supposed to be on the State at the administrative hearing to establish the correctness of the government's decision (18 NYCRR 358-5.9 [a]), the ALJs in the cases before the court improperly shifted the burden to the *pro se* claimants to prove that their failure to perform the allegedly improper WEP assignments was not willful and without good cause.

The court also found a paradox as to the timing of the various notices. To be excused in advance from performing a WEP

assignment, a participant must request an administrative hearing within 10 days of receiving the Employability Notice. However, participants are generally not advised of their actual assignments until more than 10 days have elapsed from receipt of the initial notice of employability, and the City and State take the position at administrative hearings that a challenge is not ripe until the WEP participant is told not just the job classification but the actual task.

The second order appealed from, entered July 29, 1998, clarified the scope of the plaintiff class and the terms of the preliminary injunction. The class is defined as all public assistance recipients and applicants who have been or will be classified as E-II, who have been or will be assigned to mandatory WEP jobs, and who have failed or will fail to participate in assignments that are incompatible with their medical limitations. In addition to excusing the named plaintiffs from WEP participation for the duration of this action, the injunction imposed several far-reaching obligations on the City and State defendants.

First, defendants were directed to issue three types of notices to class members on a timely basis: notices of employability clearly informing them of their employment limitations; notices of the "functional requirements" of the WEP assignments to which the aid recipient will be assigned; and timely notices informing recipients how to exercise their right to contest both their over-all employability classification and their specific WEP assignments, so that they will not lose benefits while challenging an assignment. The court enjoined defendants from assigning any E-II aid recipients to WEP jobs until adequate procedures (including the notices listed above) were put in place to protect class members' ADA rights. The City was also enjoined from sanctioning class members for failing to participate in WEP assignments that exceeded their medical limitations and the State was enjoined from affirming any such sanctions or affirming any challenged WEP assignments that were incompatible with the participant's medical condition.

■ We hold that the orders appealed from should be modified as follows. The plaintiff class should be decertified because common questions of law or fact do not predominate on most claims. To the extent that common questions predominate, such as the alleged inadequacy of standard-form notices sent to all E-II WEP participants, the governmental operations rule makes class certification unnecessary (*Davis v Croft*, 237 AD2d 163 ["any relief granted to an individual petitioner challenging a governmental operation will adequately flow to others

similarly situated under principles of stare decisis"]). The injunction should be upheld only to the extent that it suspends the named plaintiffs' WEP obligations while the action is pending and directs the City to provide E-II WEP participants with adequate and timely notice of their rights. The other relief granted by the injunction is either unnecessary or overbroad. Finally, the plaintiffs' remaining claims should be remanded to be treated as article 78 petitions.

Turning to the issue of class certification, we find first of all that the definition of the class is unworkable. The class purportedly consists of E-II WEP participants whose assignments exceed their medical limitations. However, determining who is a member of that class would require individualized examination of each person's medical history and the physical demands of her assigned task, which would defeat the class action's goal of saving judicial time and resources (*Small v Lorillard Tobacco Co.*, 252 AD2d 1, 6 [decertifying class of nicotine-addicted smokers as requiring burdensome individualized proof of class membership]). A class action would thus not be the most efficient format for adjudicating these claims (CPLR 901 [a] [5]).

Plaintiffs' anecdotal evidence does not show that there exists a class of similarly situated persons so numerous that a class action is needed to resolve their claims (CPLR 901 [a] [1]). Defendants point to statistics showing that about half of *all* State administrative hearings are resolved in favor of the aid recipient, but neither party offers any statistics about the outcome of hearings specifically on the issue of medically unsuitable WEP assignments. Even if relevant statistics were available, this is not the sort of issue that can be resolved in a class action because it requires scrutiny of each individual's medical history, WEP assignment, and administrative hearing transcript (*see, Hernandez v Hammons*, 239 AD2d 192, 194).

A related problem is plaintiffs' failure to show that common questions predominate as to the first through third and the fifth and seventh causes of action (CPLR 901 [a] [2]). Assuming there is a class of persons whom the City routinely assigns to medically inappropriate jobs (first cause of action), and to whom the State fails to afford relief (second, fifth and sixth causes of action), the fact that wrongs were committed pursuant to a common plan or pattern does not permit invocation of the class action mechanism where the wrongs done were individual in nature or subject to individual defenses (*Matter of Miles v Lascaris*, 84 Misc 2d 96, 98 [whether shelter allow-

ances, pursuant to City's uniform schedule, were adequate to meet aid recipients' needs was inappropriate issue for class action because dependent on analysis of individual circumstances]; *see also*, *Gaynor v Rockefeller*, 15 NY2d 120, 129).

The same is even more true of plaintiffs' ADA claim (third cause of action), since some members of the class may have "limitations" as .defined by the City which do not amount to "disabilities" as defined by the ADA. Figuring out whether each class member's impairment is covered by the ADA would be too burdensome in a class action format.

However, we do not dismiss the claims outright because with respect to their individual situations, the named plaintiffs have alleged sufficient facts in support of their claims that the City and State assigned them to jobs exceeding their medical limitations, misinformed them regarding their rights, and failed to protect their rights during the grievance process. We leave these matters, along with the issue of ADA coverage, for plaintiffs' individual actions.

As noted above, the governmental operations rule states that a class action is usually unnecessary because stare decisis and the uniformity of governmental operations ensure that all similarly situated persons will receive the relief ordered by the court. The IAS Court erroneously deemed applicable the narrow exception recognized in *Varshavsky v Perales* (202 AD2d 155, 156), which permits class certification when the government has defied the court's order by its "demonstrated reluctance" to extend the mandated relief to parties other than the individual plaintiffs. Application of such an exception is premature here because defendants have not flouted any previous orders (*compare*, *New York City Coalition to End Lead Poisoning v Giuliani*, 245 AD2d 49, 52-53).

Thus, the injunctive relief we uphold as regards plaintiffs' fourth cause of action, and any future relief which may be awarded to the named plaintiffs on the first through third and fifth through seventh causes of action in future article 78 proceedings, should adequately control the behavior of the City and State in like situations (*Davis v Croft, supra*). We need not decide whether certification of a properly defined class would be appropriate in the future if defendants herein refuse to respect the rights of WEP participants not parties to this action.

■ The record before us permits a finding of probability of success as to plaintiffs' contention that the current combination of notices sent by the City to WEP participants is inadequate and violates due process (plaintiffs' fourth cause of

action), to the extent that the notices fail to inform E-II WEP participants how to decline improper assignments without losing benefits while their grievances are pending. The injunctive relief granted by the IAS Court is far more extensive than necessary, however, and must be modified as discussed below.

To begin with, two of the three notice requirements imposed by the IAS Court are inappropriate. The IAS Court did not need to command the City to amend the Employability Notices to include information on the recipient's specific employment limitations. That function is already fulfilled by the PACE forms which the City is now legally obligated to supply (Social Services Law § 332-b). The court's additional directive, namely that WEP participants receive timely notice of the "functional requirements" of their assignments upon being classified as E-II, is simply not feasible if interpreted in the manner urged by plaintiffs. At any given time, there are about 35,000 persons working in WEP, a quarter of whom are E-II. There is rapid turnover in this program because participants find other work, become unable to work, or fail to comply and are dropped. Every month, about 5,000 vacancies occur. The Human Resources Administration must figure out where to assign its available WEP workers. Nearly a third of these persons do not report to their assigned sites. Accordingly, the sponsoring agency must reassign some people on the spot, taking into consideration such factors as the urgency of the particular tasks and the physical limitations of the participants. As the City persuasively argues, it would be impossible to give participants advance notice of their specific job titles and tasks because the agencies themselves do not possess this information.

Our determination on this point does not adversely affect plaintiffs and other WEP participants, as they have adequate means of challenging their assignments once they receive them at the site. The IAS Court erroneously believed this type of notice was necessary because it was concerned about paradoxical situations like Mitchell's: the ALJ considered her claims premature because she had not yet received her assignment, but the Employability Notice had led her to believe that if she waited until receiving her assignment to request a hearing, she would have to do inappropriate work while waiting for a decision. The remedy for this problem, however, is not to require earlier and more detailed information on the assignment, but to inform WEP participants at the outset that they will not lose their benefits immediately upon refusing an as-

signment as long as they show up, raise the accommodation issue with on-site supervisors, and request timely conciliation and fair hearings if need be.

We see no reason, however, why the City should not append to the Assignment Information Summary a copy of the Master Functions Checklist it provides to WEP administrators in their Policy and Procedures Manual. The checklist breaks down general categories like "Maintenance Services" into specific types of work, such as "sweep and mop floors" or "report defective equipment". This additional information might help the City reduce absenteeism by persons like plaintiff Mitchell who make assumptions based on their understanding of the very general terms used to describe their jobs on the Assignment Information Summary. To this extent, we uphold the IAS Court's directive that participants shall be informed of the functional requirements of their assignments.

This brings us to the third type of notice mandated by the IAS Court, which we uphold and elucidate as follows. The court ordered the City to provide "adequate notice on a timely basis (i.e., enough time prior to commencement of the actual work assignment) of the right to contest the above findings regarding medical limitations and the right to contest requirements of work assignments relevant to the limitations so that all existing benefits will continue pending determination of the propriety of the assignment." We read this order as merely directing the City to inform plaintiffs of the rights whose existence the City has already admitted.

Contrary to the IAS Court's belief, the current notices suffice to inform participants how they should contest employability determinations, especially now that they receive their PACE forms at the outset. The notices fall short regarding how to contest specific assignments. Accordingly, we would modify this portion of the injunction, and, as modified, affirm, to order that the Employability Notice, Assignment Information Summary, and Orientation Manual contain a concise statement of the procedures a WEP participant must follow in this situation, including but not limited to the previously quoted language from the City appellant's brief. The revised notices should also state unambiguously: (1) that a participant's challenge to an assignment will not be ripe for review until she arrives at the site and receives the assignment; (2) that she may refuse to perform the work, without immediate loss of benefits, while pursuing her grievance through each stage of the process, from complaining to the supervisor to obtaining a fair

hearing decision; and (3) reasonable deadlines for this process (e.g., how soon she must complain to the supervisor after receiving the assignment).

The balance of equities favors the individual plaintiffs, who could suffer irreparable injury if the notices are not revised (*see, State of New York v Fine*, 72 NY2d 967, 968-969 [requirements for preliminary injunction]). When this action is concluded and plaintiffs receive new notices directing them to attend new WEP assignments, they might once again risk loss of essential benefits and services, or force themselves to perform tasks exceeding their limitations, if the notices sent by the City once again fail to inform them of their rights. By contrast, it will cost the City very little to add a few new lines to their standard forms, especially when the key language has already been drafted by the City's appellate counsel.

We also uphold the portion of the injunction relieving the named plaintiffs from WEP participation and suspending sanctions against them while this action is pending. The remainder of the injunction must be vacated as it purports to grant the same relief to a plaintiff class which does not exist. Moreover, the balance of equities as to this part of the injunction clearly favors defendants, who argue that they risk financial penalties such as loss of Federal aid (and for the City, loss of State aid as well) if they fail to place a certain number of aid recipients in a work program (42 USC § 609 [a] [3]; Social Services Law § 335-b [1]). By contrast, the IAS Court failed to identify any WEP recipients other than the named plaintiffs who would suffer irreparable injury unless the court basically brought the entire WEP assignment process to a halt. If any WEP participants have been or will be penalized by the City or the State's Administrative Law Judges because the participants were misled by the inadequate notices, the appropriate remedy is an article 78 proceeding.

Accordingly, the orders of the Supreme Court, New York County (Emily Goodman, J.), entered May 1, 1998 and July 29, 1998, granting plaintiffs' motion for class certification and a preliminary injunction, and denying defendants' cross motion to dismiss the complaint or convert plaintiffs' claims into individual article 78 proceedings, should be modified, on the law and the facts, to deny plaintiffs' motion for class certification; vacate the injunction except to the extent that it suspended the individual plaintiffs' WEP obligations pendente lite and directed the City to give plaintiffs adequate notice of their right to contest medically inappropriate assignments; order

that future notices contain a clear statement of plaintiffs' rights, including the language from defendant's brief quoted *supra*, and a copy of the WEP Administrators' Master Functions Checklist; and grant defendants' cross motion to convert plaintiffs' remaining claims into article 78 proceedings pursuant to CPLR 7804 (g); and otherwise affirmed, without costs.

WILLIAMS, MAZZARELLI and SAXE, JJ., concur.

Orders, Supreme Court, New York County, entered May 1, 1998 and July 29, 1998, modified, on the law and the facts, to deny plaintiffs' motion for class certification; vacate the preliminary injunction except to the extent that it suspended the individual plaintiffs' Work Experience Program obligations pendente lite and directed the City to give plaintiffs adequate notice of their right to contest medically inappropriate assignments; order that future notices contain a clear statement of plaintiffs' rights, including the following language: "The proper way to contest a WEP assignment as medically inappropriate is to report, learn what the assignment is, utilize the available mechanisms to try to work out any disagreements, and, ultimately, seek a fair hearing if the resolution is not satisfactory. During the process, the WEP participant will receive aid even if he or she refuses to do the work." and a copy of the Work Experience Program Administrators' Master Functions Checklist; and grant defendants' cross motion to convert plaintiffs' remaining claims into CPLR article 78 proceedings pursuant to CPLR 7804 (g); and otherwise affirmed, without costs.