■ CITY OF NEW YORK et al., Appellants, v THOMAS A. MAUL, Defendant. L.J. et al., Intervenors-Respondents v JOHN B. MATTINGLY, as Commissioner, New York City Administration for Children's Services, Appellant, et al., Defendant. [873 NYS2d 540]—

Order, Supreme Court, New York County (Marilyn Shafer, J.), entered May 1, 2008, which granted plaintiffs-intervenors' motion for class certification, and denied the motion of defendant-appellant New York City Administration for Children's Services for partial summary judgment, affirmed, without costs.

Plaintiffs-intervenors are mentally retarded and developmentally disabled individuals. All of them are, or were, in the foster care system under the aegis of defendant Administration for Children's Services (ACS). Defendant New York State Office of Mental Retardation and Developmental Disabilities (OMRDD) has the responsibility, pursuant to the Mental Hygiene Law, to "assure the development of comprehensive plans, programs,

and services in the areas of research, prevention, and care, treatment, habilitation, rehabilitation, vocational and other education, and training of persons with mental retardation and developmental disabilities" (Mental Hygiene Law § 13.07 [a]). Plaintiffs claim that both ACS and OMRDD jointly failed to properly provide for their care.

ACS, plaintiffs contend, has no uniform policy for identifying individuals who are in need of OMRDD services, does not train its staff to recognize such individuals, and rarely coordinates with OMRDD in this regard, despite OMRDD's expertise in the area. Even when individuals are identified by ACS as needing services, plaintiffs claim that ACS often fails to refer them to OMRDD for further evaluation. When ACS does make a referral, plaintiffs assert that the referral information is often incomplete, resulting in OMRDD's rejection of the information packet and further delay in delivery of the services to which the applicant has already been found entitled. Plaintiffs claim that ACS' lackadaisical, ineffective methods are especially harmful to those persons close to aging out of the foster care system, since it significantly limits the time OMRDD has to develop an individual's placement plan.

Plaintiffs contend that OMRDD shares responsibility for the breakdown in providing appropriate care for mentally retarded and developmentally disabled individuals and independently fails to fulfill its statutory duties. For example, they claim that OMRDD categorically refuses to provide services, other than residential placement, to foster children, even though residential placement is just one of several services offered to similarly disabled children who are not in foster care. In addition, they claim that OMRDD will only accept placement referrals from ACS for those for whom the permanency planning goal is residential placement. Even then, plaintiffs assert that the waiting list for placement is unreasonably long and that people for whom immediate placement is particularly crucial are given no special consideration.

Some individuals, plaintiffs claim, have languished on OMRDD's wait list for as long as nine years without finding temporary placement. In those cases, ACS has placed mentally retarded and developmentally disabled people in facilities pending placement by OMRDD that are often unduly restrictive and highly inappropriate. Plaintiffs assert this is because ACS performs only cursory investigations into the quality of facilities. ACS also fails to communicate each person's specific needs to the facility's staff before the placement.

Plaintiffs allege that, other than themselves, there are at

least 150 individuals who are adversely affected by these systemic failures. Accordingly, they sought class certification. Most of the people proposed for the class were those who have been found eligible for OMRDD services but who have been on a waiting list for an inordinate period of time. Plaintiffs also claim that relief is necessary for eligible individuals whom ACS has not yet referred to OMRDD and those whose referral was rejected by OMRDD because of a procedural defect in the referral packet prepared by ACS. Further, they wish to represent those who had aged out of the ACS system prior to placement and those who need services other than adult residential care but are not receiving such services from ACS or OMRDD.

The motion court certified the class and defined it as plaintiffs had proposed: "Individuals with developmental disabilities who are in or have been in New York City Administration for Child[ren's] Services' (ACS's) care or custody and who, during their time in ACS's care or custody, have not received or did not receive services from ACS and the New York Office of Mental Retardation and Developmental Disabilities to which they were or are entitled."

CPLR 901 (a) requires that to maintain an action on behalf of a class, it must be established that

"1. the class is so numerous that joinder of all members . . . is impracticable;

"2. there are questions of law or fact common to the class which predominate over any questions affecting only individual members;

"3. the claims or defenses of the representative parties are typical of the claims or defenses of the class;

"4. the representative parties will fairly and adequately protect the interests of the class; and

"5. a class action is superior to other available methods for the fair and efficient adjudication of the controversy." This section has been interpreted to require that "[t]hese criteria . . . be broadly construed not only because of the general command for liberal construction of all CPLR sections (see CPLR 104), but also because it is apparent that the Legislature intended article 9 to be a liberal substitute for the narrow class action legislation which preceded it" (*Friar v Vanguard Holding Corp.*, 78 AD2d 83, 91 [1980]).

Guided by this notion of liberality, we find that plaintiffs satisfied all of these factors. First, there are at least 150 class members. ACS does not dispute that the numerosity requirement is satisfied. Second, all members of the class are similarly

situated because they allege the same deprivation of specific governmental services to which they are entitled by law. Indeed, all of the class members trace their predicament to the identical violations of law alleged to have been committed by ACS and OMRDD. While ACS argues that the class lacks commonality because to determine the appropriateness of a particular facility requires an individualized inquiry into that individual's needs, it ignores all of the other alleged harmful results of its conduct which do not require specific factual inquiry. These include unreasonably long wait lists for placement, failures to refer individuals for necessary care and failures to submit complete referral packages. These harms predominate and it is "predominance, not identity or unanimity," that is the linchpin of commonality (*Friar*, 78 AD2d at 98; *see also Brad H. v City of New York*, 185 Misc 2d 420, 424 [Sup Ct, NY County 2000], *affd* 276 AD2d 440 [2000] ["(e)ven though there may be some questions of law or fact which affect some individual members of the class but not others . . . that is not a reason to deny class certification"]).

Moreover, the existence of commonality: "should not be determined by any mechanical test, but rather, 'whether the use of a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated.' " (*Friar*, 78 AD2d at 97, quoting *LaMar v H & B Novelty & Loan Co.*, 55 FRD 22, 25 [D Or 1972].)

The remaining prerequisites for class certification under CPLR 901 (a) were also fulfilled. Plaintiffs' claims meet the typicality requirement for the same reasons they satisfy the commonality test. That is, plaintiffs' claims and the claims of the class generally flow from the same alleged conduct. The class's interests will be adequately protected because it is represented by experienced counsel. Also, no conflict exists between the interests of plaintiffs and the class as a whole. To the extent that ACS identifies litigation in the Family Court as an alternative method for adjudicating the claims herein, that forum is inadequate. The limited jurisdiction of the Family Court would prevent it from granting most of the relief sought by the class. Finally, ACS is incorrect that the claims are nonjusticiable, as the action seeks neither to impose policy determinations upon a governmental agency nor to direct an agency as to the manner in which it exercises discretionary functions. Rather, the action attempts to obtain only those rights conferred on the individuals by the legislative branch (*see Klostermann v Cuomo*, 61 NY2d 525 [1984]).

We reject ACS' argument that the action should have been

dismissed for mootness because each of the plaintiffs has now received the services to which each of them claims to be entitled. This case fits precisely within the exception to the mootness doctrine for cases involving issues important to the public that are likely to evade review (*see e.g. Matter of Hearst Corp. v Clyne*, 50 NY2d 707, 714-715 [1980]). If the case is dismissed the significant issue of whether ACS is complying with law will remain unresolved. Moreover, because an individual's time in the foster system is necessarily temporary, there is no guarantee that future cases will not likewise become moot.

The cases on which the dissent relies regarding commonality are inapposite. In *Solomon v Bell Atl. Corp.* (9 AD3d 49 [2004]), this Court decertified a class of people who alleged that they had purchased internet access service from the defendant based on deceptive advertising. This Court held that the commonality test was not met because the plaintiffs could not establish that all of the proposed class members had been exposed to the same advertisement or to any advertisement at all. This case is dramatically different. Here, all of the class members trace their predicament to the identical violations of law allegedly committed by ACS and OMRDD. Furthermore, purchase of advertised internet access can hardly be compared to care critical for the well-being of mentally retarded and developmentally disabled children.

In *Mitchell v Barrios-Paoli* (253 AD2d 281 [1999]), the proposed class members were public assistance recipients assigned to New York City's Work Experience Program as a condition for receiving benefits. They challenged the particular work assignments they were given, which they claimed were inappropriate to their particular disabilities. This Court decertified the class, holding that: "Assuming there is a class of persons whom the City routinely assigns to medically inappropriate jobs . . . and to whom the State fails to afford relief . . . the fact that wrongs were committed pursuant to a common plan or pattern does not permit invocation of the class action mechanism where the wrongs done were individual in nature or subject to individual defenses." (253 AD2d at 291.) Because each class member's disability and work assignment were potentially unique, the economies which class actions are intended to provide did not exist in that case. Again, this case is factually and legally distinguishable.

Here, there is a "common plan or pattern" and the wrongs done were, largely, not "individual in nature." Certainly, an individualized assessment is not required to determine whether a foster child who was found eligible for OMRDD services but

allowed to languish on a wait list for years, rather than receive necessary services, qualifies for the class. Nor, need a detailed inquiry be had to ensure that a foster child eligible for OMRDD services but rejected by OMRDD because her referral papers were not completed properly by ACS belongs in the class.

We also reject the dissent's application of the United States Supreme Court's constrained exception to the mootness doctrine. That exception applies only where the very same individual plaintiff whose claim has been rendered moot is likely to become embroiled in the same controversy again. As even the dissent concedes, that exception is grounded in the United States Constitution's case and controversy clause, which has no analog in the New York State Constitution. Instead, the dissent relies on an observation by the Court of Appeals in *Matter of Hearst Corp.* that the principle that a court is limited to determining rights of persons which are actually controverted before it "is founded both in constitutional separation-of-powers doctrine, and in methodological strictures which inhere in the decisional process of a common-law judiciary" (50 NY2d at 713-714). Thus, the dissent suggests that there is no reason not to apply the more limited exception. However, the Court of Appeals itself did not believe that to be the case. In the very same case the Court reiterated that the exception to the mootness doctrine can apply even where "other members of the public" would benefit from judicial review (*id.* at 715).

We see no reason to wait for "an express ruling from the Court of Appeals," as the dissent would require. The Court of Appeals has ruled on the issue repeatedly since *Matter of Hearst Corp. (see e.g. Matter of M.B.*, 6 NY3d 437, 447 [2006]; *Mental Hygiene Legal Servs. v Ford*, 92 NY2d 500, 505-506 [1998]; *Community Bd. 7 of Borough of Manhattan v Schaffer*, 84 NY2d 148, 154 [1994]; *Matter of Chenier v Richard W.*, 82 NY2d 830, 832 [1993]), and has consistently restated the exception to the mootness doctrine applied by the motion court here.

Indeed, we can hardly perceive of a case better suited to application of the exception than this one. The people who have the most interest in the immediate adjudication of the claims herein are among the most disadvantaged found in society. Not only were they born with significant obstacles to success, they were neglected, abandoned, or otherwise deprived of care by their parents. Now, it is alleged that the safety net designed by the Legislature for them has failed them as well. Judicial review of these claims should be had now, so that, if it is determined that the system for care of mentally retarded and developmentally disabled persons needs to be corrected, it can be corrected

without any unnecessary delay. Concur—Lippman, P.J., Mazzarelli, Buckley and DeGrasse, JJ.

McGuire, J., dissents in a memorandum as follows: The class certified by Supreme Court is the one proposed by plaintiffs-intervenors: "Individuals with developmental disabilities who are in or have been in New York City Administration for Child[ren's] Services' (ACS's) care or custody and who, during their time in ACS's care or custody, have not received or did not receive services from ACS and the New York State Office of Mental Retardation and Developmental Disabilities to which they were or are entitled." As Supreme Court observed in the course of granting the class certification motion, "intervenors do not point to affirmative policies which they claim violate the law."

In my view, the class certification motion is controlled by well-settled law and, in particular, Justice Rosenberger's decision in *Mitchell v Barrios-Paoli* (253 AD2d 281 [1999]). In that case, the proposed class consisted of all individuals who allegedly were assigned by the New York City Human Resources Administration to work experience program jobs that exceeded their medical limitations. The panel in *Mitchell* unanimously found this definition of the class to be "unworkable" because: "determining who is a member of that class would require individualized examination of each person's medical history and the physical demands of her assigned task, which would defeat the class action's goal of saving judicial time and resources (*Small v Lorillard Tobacco Co.*, 252 AD2d 1, 6 [1998] [decertifying class of nicotine-addicted smokers as requiring burdensome individualized proof of class membership])" (*Mitchell*, 253 AD2d at 291).

Whether a putative class member was denied services to which he or she was entitled is not a question that can be resolved in the abstract. Rather, as in *Mitchell*, individualized determinations would be necessary to determine whether any putative member of the class is a member of the class. Indeed, whether any individual is a member of the class necessarily entails a fact-bound determination that he or she has a valid claim on the merits. Thus, to determine whether any individual is a member of the class, not only must the particular services he or she did not receive be identified, it also must be established that the individual was entitled to those services under state or federal law. The necessity for these individual and fact-specific determinations makes it pointless at best to certify a class (*id.*) For these reasons, as in *Mitchell*, we should reverse and deny the motion for class certification.

Justice Ellerin's opinion in *Solomon v Bell Atl. Corp.* (9 AD3d 49 [2004]) also is directly on point. In *Solomon,* a class was certified by Supreme Court in an action alleging deceptive advertising about high-speed internet service. The named plaintiffs, however, did "not demonstrate[ ] that all members of the class saw the same advertisements" (9 AD3d at 53). To the contrary, the named plaintiffs "did not all see the same advertisements; some saw no advertisements at all before deciding to become subscribers" (*id.*). In addition, the content of the advertising "varied widely and not all the advertisements contained the alleged misrepresentations" (*id.*). Accordingly we concluded that "questions of individual members' exposure to the allegedly deceptive advertising predominate" (*id.*).

This Court decertified the class for another reason, after assuming arguendo that all members of the class had seen the same advertisements: "questions as to whether each individual was reasonably misled by them predominate, given the alternative sources of information about [the internet] service that each may have had" (*id.* at 54). Thus, "individual trials would be required to determine whether a reasonable consumer . . . would have been misled by defendants' representations" (*id.*; *see also Hazelhurst v Brita Prods. Co.,* 295 AD2d 240, 242 [2002] [decertifying class where, "(l)ike reliance, injury will require individual determinations which are not common to the class"]).

That the intervenors allege systemic failures by ACS does not support the certification of the class. As Justice Rosenberger observed in *Mitchell,* "the fact that wrongs were committed pursuant to a common plan or pattern does not permit invocation of the class action mechanism where the wrongs done were individual in nature or subject to individual defenses" (*Mitchell,* 253 AD2d at 291; *see also J.B. ex rel. Hart v Valdez,* 186 F3d 1280, 1289 [10th Cir 1999] ["We refuse to read an allegation of systematic failures as a moniker for meeting the class action requirements. . . . For a common question of law to exist, the putative class must share a discrete legal question of some kind. . . . Here, . . . plaintiffs merely attempt to broadly conflate a variety of claims to establish commonality via an allegation of systematic failures" (internal quotation marks and citations omitted)]).

The majority cites a litany of alleged failures by ACS and the Office of Mental Retardation and Developmental Disabilities (OMRDD) to support a claim of "systemic failure." The first point to be made, however, is that the majority's reliance on claimed "systemic failures" is misplaced. The statements quoted above from our opinion in *Mitchell* and from the Tenth Circuit's

opinion in *J.B. ex rel. Hart* are squarely at odds with the majority's position. Notably, the majority simply ignores these statements of the law and makes no effort to distinguish *Mitchell* and *J.B. ex rel. Hart* in this regard.

Second, the highly fact-bound nature of the alleged failures is apparent. The majority writes, for example, that "[m]ost of the people proposed for the class were those who have been found *eligible* for OMRDD services but who have been on a waiting list for an *inordinate* period of time. Plaintiffs also claim that relief is necessary for *eligible individuals* whom ACS has not yet referred to OMRDD and those whose referral was rejected by OMRDD because of a *procedural defect* in the referral packet prepared by ACS" (emphasis added). Under the first sentence quoted above, membership in the class will depend, among other things, on identifying those who were found "eligible" (but presumably not any persons who may incorrectly have been found eligible) *and* who have been waiting for a period of time that can be characterized, by some unknown standard, as "inordinate." Under the second sentence, membership in the class will depend, among other things, on identifying other "eligible" individuals—which certainly is a highly fact-bound process— *and* whose referral was rejected because of a "procedural defect," which surely must be determined on a case-by-case basis.

Similarly, the majority relies on allegations that "the waiting list for placement is *unreasonably long* and that people for whom immediate placement is *particularly crucial* are given no special consideration" (emphasis added). Obviously enough, case-by-case determinations must be made to determine whether any particular putative class member was on a waiting list for an "unreasonably" long period and whether the immediate placement of any individual is "particularly crucial." So, too, with the majority's reliance on allegations of placements by OMRDD "that are often *unduly restrictive*" and *"highly inappropriate"* (emphasis added).

My point is the one made in *Mitchell, Solomon* and *Hazelhurst*. In all three cases we held that class certification was inappropriate because "determining who is a member of th[e] class would require individualized examination of each person's medical history and the physical demands of her assigned task," (*Mitchell*, 253 AD2d at 291), "individual trials . . . to determine whether a reasonable consumer acting reasonably in each plaintiff's circumstances would have been misled" (*Solomon*, 9 AD3d at 54), and "individual determinations which are not common to the class" (*Hazelhurst*, 295 AD2d at 242). The ma-

jority has nothing to say with respect to the above-quoted grounds for our decisions in these three cases. Rather, it refers to or quotes from portions of the opinions in *Mitchell* and *Solomon* discussing some of the particular facts supporting the ground for the holdings that class certification was inappropriate because of the necessity for mini-trials to determine the threshold issue of membership in the class.

I also disagree with the majority's conclusion that Supreme Court properly denied the City's motion for partial summary judgment dismissing as moot the intervenors' claims for prospective relief. Of the 11 intervenors, eight now are in OMRDD's care and thus neither need nor are entitled to any services from ACS. The remaining three intervenors were referred to and accepted by OMRDD and are awaiting placement; accordingly, they have only historical and not current objections to planning, placements and services provided by ACS. For these reasons, the claims for prospective relief should have been dismissed as moot (*Saratoga County Chamber of Commerce v Pataki*, 100 NY2d 801 [2003], *cert denied sub nom. Pataki v Saratoga County Chamber of Commerce, Inc.*, 540 US 1017 [2003]).

The intervenors essentially concede that the claims for prospective relief otherwise are moot but, relying on *Matter of Jones v Berman* (37 NY2d 42 [1975]), argue that the questions printed in the amended interview complaint "being of importance and interest and because of the likeliness that they will recur, are properly entertainable . . . irrespective of any allegation of mootness" (37 NY2d at 57).[1] In my view, however, the exception to the mootness doctrine for disputes that are likely to recur, typically evade review and raise important questions (*see Matter of Hearst Corp. v Clyne*, 50 NY2d 707, 714-715 [1980]) does not apply here.

In the first place, this exception requires, among other things, "a reasonable expectation that the same complaining party will be subject to the same action again" (*Davis v Federal Election Commn.*, 554 US —, —, 128 S Ct 2759, 2769 [2008] [internal

---

1. The intervenors are not persuasive to the extent they argue that the claims for prospective relief are not moot because appropriate placements for certain of them occurred "not due to ACS fulfilling its statutory requirements, but rather through the efforts of [their] counsel and the State." The Supreme Court rejected a similar claim that a case should not be considered moot because, among other things, of "the dilatory tactics of the state attorney general's office" (*Spencer v Kemna*, 523 US 1, 18 [1998]). As the Court stated, "mootness, however it may have come about, simply deprives us of our power to act; there is nothing for us to remedy, even if we were disposed to do so. We are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong" (*id.*).

quotation marks and citation omitted]; *see also Spencer v Kemna*, 523 US at 17-18 [same and citing other decisions so holding]; *East Meadow Community Concerts Assn. v Board of Educ. of Union Free School Dist No. 3*, 18 NY2d 129, 135 [1966] ["It is settled doctrine that an appeal will . . . be entertained where, as here, the controversy is of a character which is likely to recur not only with respect to the parties before the court but with respect to others as well"]). This requirement is a corollary of "the core requirement that a court can act only when the rights of the party requesting relief are affected" (*Society of Plastics Indus. v County of Suffolk*, 77 NY2d 761, 772 [1991]). After all, if the party requesting relief will not be subject to the same action again, the rights of that party will not be affected, let alone "directly affected" (*Matter of Hearst Corp.*, 50 NY2d at 714), by a determination on the merits. Here, there is no contention that any of the intervenors will be subject again to the same allegedly unlawful action. For this reason alone, the claims for prospective relief do not fall within this exception to the prohibition against deciding moot disputes.

In *Matter of Hearst Corp.*, the Court of Appeals stated that one element of this exception is "a likelihood of repetition, either between the parties *or among other members of the public*" (50 NY2d at 714-715 [emphasis added]). The highlighted language, which was not necessary to the Court's resolution of the appeal, is not inconsistent with the requirement that the party seeking relief show a reasonable expectation that it will be subject to the same action again. The Court may have had in mind a case in which the party seeking relief would be subject again to the same action, but as a result of the conduct of someone other than a party to the action. To the extent the highlighted language can be read otherwise, I would not regard it as authoritative. Although New York's Constitution does not contain an analogue to the requirement of the federal constitution of a case or controversy (*Society of Plastics Indus.*, 77 NY2d at 772), the "fundamental principle" of New York law that "forbids courts to pass on academic, hypothetical, moot, or otherwise abstract questions, is founded both in constitutional separation-of-powers doctrine, and in methodological strictures which inhere in the decisional process of a common-law judiciary" (*Matter of Hearst Corp.*, 50 NY2d at 713-714). Given that New York's prohibition against deciding moot disputes also is of constitutional dimension, I would follow the unequivocal precedents of the United States Supreme Court in the absence of an express ruling from the Court of Appeals that the party seeking relief need not show that it will be subject to the same action again.

The majority dismisses the holdings of the United States Supreme Court in *Davis*, *Spencer* and the long line of cases they cite, breezily disparaging these holdings as a *"constrained* exception to the mootness doctrine" (emphasis added). As the decisions make plain, however, these holdings inhere in fundamental, constitutional precepts of separation of powers. To be sure, the majority is correct that there are decisions of the Court of Appeals in which the Court had held that a dispute was not moot even though it appears that the plaintiff would not be subject again to the same allegedly unlawful action. But none of those decisions provide any reason to think that the issue of whether the plaintiff must be subject again to the same allegedly unlawful action was raised, let alone decided. Accordingly, these decisions cannot be regarded as having decided the issue (*see Matter of Seelig v Koehler*, 76 NY2d 87, 92 [1990], *cert denied* 498 US 847 [1990] [distinguishing prior decisions and observing that "the identification and weighing of all the unique and particular facts of each case governs"]; *Roosa v Harrington*, 171 NY 341, 350 [1902] ["each case, as it arises, must be viewed and decided according to its own particular facts and circumstances, and will become a controlling precedent, only, where the facts are the same"]). The Court of Appeals may decide not to follow the holdings of the United States Supreme Court. If so, however, it surely will be for some substantive reason grounded in the structure of New York's Constitution—the majority offers none—and will not, for the reasons stated above, be premised on the absence of the phrase "case or controversy" in the New York Constitution.[2]

Nor does the claimed importance of the intervenors' claims for prospective relief save them from dismissal on mootness grounds. On the one hand, if only the particular, fact-bound claims of each intervenor were litigated, resolving any of them favorably to an intervenor would establish nothing more than that the intervenor did not receive some service or services from ACS to which he or she was entitled under the specific

---

**2.** Permitting a party to maintain an action because another party, i.e., not the plaintiff, is or may be subject to the same allegedly unlawful action legitimizes what Professor Monaghan describes as "a genuine third party claim—one not susceptible of a first party formulation" (Monaghan, *Third Party Standing*, 84 Colum L Rev 277, 282 [1984]). As Professor Monaghan observes, to the extent that a litigant presents "a genuine third party claim . . . the litigant is essentially a judicially licensed private attorney general. Talk of third party standing in these cases obscures the doubtful basis of federal judicial authority to create such private attorneys general" (*id.*; *see also id.* at 310-316 [questioning the authority of the judiciary to license such third-party claims]).

facts of the case. As ACS argues, a declaration that ACS should have acted differently with respect to an intervenor would not alter the scope of discretion that ACS may exercise in another case. Thus, the resolution of the intervenors' claims for prospective relief would have "no appreciable public significance beyond the immediately affected parties" (*Matter of Colella v Board of Assessors of County of Nassau*, 95 NY2d 401, 411 [2000]). On the other hand, permitting the intervenors to prescind from the particular facts of each intervenor's claim and litigate generalized grievances against ACS is incompatible with basic, separation-of-powers precepts (*see Lujan v Defenders of Wildlife*, 504 US 555, 576 [1992] ["Vindicating the public interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive" (emphasis deleted)]; *id.* at 577 ["to convert the undifferentiated public interest in executive officers' compliance with the law into an 'individual right' vindicable in the courts is to permit (the) transfer from the President to the courts (of) the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed,' Art. II, § 3"]).

Because the exception to the prohibition against deciding moot disputes does not apply for the foregoing reasons, I need not determine whether ACS is correct in arguing that claims that foster children with developmental disabilities are denied services to which they are entitled do not typically evade review given the broad and ongoing jurisdiction of Family Court over foster children. I note, however, that although decertification would be required if ACS' argument based on Family Court's jurisdiction is correct, the majority disposes of that argument with the conclusory assertion that Family Court would be an "inadequate" forum because "[t]he limited jurisdiction of the Family Court would prevent it from granting most of the relief sought by the class." The majority, however, does not identify either the respects in which that jurisdiction is limited or the particular forms of relief Family Court is incapable of granting to individual class members. Finally, because I believe that the class should be decertified in any event, I also need not address the question of whether dismissal of the intervenors' claims for prospective relief provides an independent ground for decertifying a class seeking that relief (*cf. Simon v Eastern Ky. Welfare Rights Organization*, 426 US 26, 40 n 20 [1976] ["That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class

. . . which they purport to represent" (internal quotation marks and citation omitted)]).