**Mikhail FRIDMAN Plaintiff,**

v.

**The CITY OF NEW YORK, HS Systems, Inc., Marva Livingston Hammons and Aurelio Salon, Jr., M.D., Defendants.**

**No. 97 CIV 6099 VM.**

United States District Court, S.D. New York.

Jan. 28, 2002.

---

David S. Preminger, Rosen, Preminger & Bloom, Lawrence Allen Goldberg, Gordon, Goldberg & Juengst, P.C., New York City, for Plaintiff.

Heidi Grossman, Paul A. Crotty, John F. Wirenius, Michael D. Hess, Corporation Counsel of the City of NY, Christopher Delamere Clarke, Leahey & Johnson, David Andrew Crichlow, Pillsbury Winthrop LLP, Michael Conforti, Leahey & Johnson, P.C., New York City, for Defendants.

### DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Mikhail Fridman (hereinafter "Fridman") brought this action under 42

U.S.C. § 1983, 42 U.S.C. § 1985(c), 42 U.S.C. § 12133, Article 1 §§ 6 and 11 of the Constitution of the State of New York, New York State Civil Rights Law § 40–c, and New York state law regarding medical malpractice, negligence, and breach of contract. The named defendants are the City of New York (hereinafter "City"), HS Systems, Inc. (hereinafter "HSS"), New York City Commissioner of Social Services Marva Livingston Hammons (hereinafter "Hammons") and Dr. Aurelio Salon Jr. (hereinafter "Salon") (collectively "Defendants"). Fridman alleges that Defendants violated his rights by performing negligent medical evaluations and wrongly assigning and compelling him to do strenuous work, thereby causing him to suffer a heart attack, depression and sexual dysfunction. Defendants brought motions for summary judgment against all of Fridman's claims, asserting that Fridman cannot show that the conduct of HSS or Salon constituted state action, that Fridman was not deprived of any right protected under the federal statutes he invokes and that there are no bases in law or fact for the remaining claims. For the foregoing reasons, Defendants' motions for summary judgment are granted.

## I. FACTUAL BACKGROUND

Despite the volume of briefing in this matter, remarkably the basic facts underlying the action are not in dispute.[1] Fridman, along with his wife Eleanora Zlotnikova (hereinafter "Zlotnikova") and child, arrived in the United States in September 1995. Fridman applied for public assistance on January 15, 1996. During the application process, Zlotnikova served as Russian–English translator because Fridman spoke little English. They qualified for Aid to Dependent Children of Unemployed Parents (hereinafter "ADC/U"), a federally funded public assistance program administered by, *inter alia*, the City's Human Resources Administration (hereinafter "HRA") and the City's Office of Employment Services (hereinafter "OES").

At the time of their application, a case worker informed Fridman and his wife that as a condition of receiving ADC/U benefits, one of them must participate in the City's Work Experience Program (hereinafter "WEP"). WEP may be more commonly known as "workfare"; under WEP, as a condition of ADC/U benefits, able-bodied recipients are required to perform some work for the City. WEP was designed to prepare "people on public as-

1. Except where specifically indicated, the facts recited here are taken from the following documents in the record of this action: Declaration of Isaac Kaufman dated December 8, 2000 (hereinafter "Kaufman Decl."); Affidavit of Lawrence A. Goldberg, dated March 8, 2001 (hereinafter "Goldberg Aff."); Deposition of Eleonora Zlotnikova dated October 29, November 12, 1998 (hereinafter "Zlotnikova Dep."), attached as Ex. G to the Kaufman Decl.; Deposition of Seth Diamond dated Oct. 22, 1998 (hereinafter "Diamond Dep.") attached as Ex. C to the Kaufman Decl.; Deposition of Mikhail Fridman, dated June 11, 12, 15, 16, 17, 18, 29, 30 and July 1, and 7, 2000 (hereinafter "Fridman Dep.") attached as Ex. M to the Kaufman Decl. and Ex. G to the Goldberg Aff.; Deposition of Dr. Sergey Gabinsky, dated November 4, 1998, attached as Ex. N to the Kaufman Decl.; Plaintiff's Rule 56.1 Statement; Affidavit of Yvonne Jones dated December 8, 2000 (hereinafter "Jones Aff."); Affidavit of Aurelio Salon Jr., M.D., dated Dec. 7, 2000 (hereinafter "Salon Aff."); Affidavit of Verdin Rosemin (hereinafter "Rosemin Aff."); Affidavit of Stephen Bradley (hereinafter "Bradley Aff."); Deposition of Aurelio Salon, Jr., dated March 31, 1999 (hereinafter "Salon Dep.") attached as Ex. R to the Kaufman Decl.; Deposition of Norma Claxton, dated March 3, 2000, (hereinafter "Claxton Dep.") attached as Ex. E to the Kaufman Decl.; and the Affidavit of Christopher D. Clark, dated December 8, 2000 (hereinafter "Clark Aff."). In view of the general agreement to the facts recited here, further specific citation to these documents will be omitted.

sistance for employment and allow them to fulfill their reciprocal obligation to the City for receiving benefits." (Diamond Dep., at 48, 53.)

During that meeting, Fridman stated that he would be the one to work, and that he was physically able to work. Also on that date, he was provided with, and signed, a Notification of Employability and of Right to Contest form which clearly informed Fridman of his right to a fair hearing on the issue of employability and set forth the procedures for obtaining a fair hearing. Fridman and his family began receiving cash assistance, Medicaid and food stamps.

By letter dated February 27, 1996, OES informed Fridman that his work assignment assessment was scheduled for March 13, 1996. Fridman attended this interview and was assigned to clean streets for the City's Department of Sanitation for 55 hours every two weeks. He began this assignment in late March 1996.

On April 19, 1996, Fridman returned from work flushed and went to First City Medical Group in Brooklyn for an examination. Fridman was diagnosed with high blood pressure and was sent to the emergency room at Victory Memorial Hospital. He was prescribed Vasotec, a medication for high blood pressure, and was discharged that day. Fridman's blood pressure remained under control so long as he took his medication.

Immediately following April 19, 1996, Fridman stopped reporting to his WEP assignment, but continued to attend a course in major home appliance repair, through the Federal Employment Guidance School, that met five mornings a week. At a follow-up examination at First City Medical Group, Fridman requested and obtained a letter from Dr. Gabinsky stating that he was under evaluation for hypertension and unable to perform hard

work (hereinafter the "Gabinsky Letter"). Zlotnikova sent the Gabinsky Letter to Fridman's OES caseworker. Shortly thereafter, Fridman received a letter instructing him to attend an appointment on June 20, 1996, at OES.

At the June 20, 1996 appointment, Fridman submitted a formal request for a medical exemption from his WEP assignment due to high blood pressure and scheduled an appointment for an employability assessment examination.

On June 28, 2001, Fridman attended the first part of a two-part employability assessment examination conducted by HSS. HSS is a private corporation that, pursuant to a contract with the HRA, performs medical evaluations of applicants for exemption from the work requirements of the WEP program. HSS also performs work under contract for private sector entities. HSS's performance is governed by a contract with HRA that sets forth a detailed protocol for the examinations. (Jones Aff., ¶¶ 11, 16, Ex. C (hereinafter the "Contract") at 5–17, 21–24.)

The examination may have as many as four parts; all applicants for exemption undergo the first two. During the first part of the examination the applicant undergoes a specific set of tests. During the second part of the exam, the applicant appears for his appointment and is assigned to the first available physician at HSS's facility. The physician uses the test results and his independent examination of the applicant at that appointment to make an employability assessment. If the physician finds the applicant to be employable with limitations, he is to complete certain forms, provide that paperwork to the applicant, and the applicant is directed to the OES office located in the same building. At that point, the roles of HSS and the physician end and neither one has any

further influence on the OES's selection of a work assignment.

An applicant would undergo the third and fourth parts of the employability assessment examination only if, during the second part of the examination, the physician assesses him to be permanently disabled.

A further aspect of the contractual relationship between HSS and the City bears mention. HSS physicians are paid based on the number of applicants they evaluate. There are no financial incentives in the Contract to encourage a physician to find patients employable. Indeed, according to the statistics that HSS must keep pursuant to the Contract, HSS physicians find OES applicants for exemption to be employable less frequently than they find them unemployable.

■ In this particular case, on July 2, 1996, Fridman, accompanied by his wife, appeared for the second part of the examination. Salon, a physician employed by HSS, was assigned to conduct the examination, which Fridman alleges lasted between three and five minutes. Fridman alleges that HSS engaged in a pervasive pattern and custom of performing the second part of the examination in a cursory manner and of failing to notify applicants of HSS's assessment or of their rights. To this end, Fridman submits the affidavits of two other men who attest to their having spent a brief period with the HSS physician during the second part of the HSS examination for purposes of employability assessment and to not having been informed by the physician, or OES caseworker, of their assessment or rights to a fair hearing. (Rosemin Aff.; Bradley Aff.) [2]

Salon found that Fridman had a history of hypertension, joint pains, decreased visual acuity and elevated cholesterol. (Kaufman Decl., ¶ 19, Ex. Q; Salon Dep., at 70, 85.) Salon gave Fridman notice of the limited purpose of his examination and referred Fridman to seek further attention for his elevated cholesterol from his primary care physician. (Salon Dep., at 92; Jones Aff., ¶ 32, Ex. E.)

Salon does not recall the particular assessment, but was able to explain the assessment form he completed and state his practice and routine which was to complete an employability assessment for OES based on the test results, independent examination and findings. Salon submitted an assessment of Fridman as "employable subject to limitations" and recommended that Fridman's work capacity was "light." (Kaufman Dec. ¶ 19, Ex. Q; Salon Dep., at 83–87.) Fridman asserts that Salon did not inform him of his classification status or the activities in which he might engage, like occasional, non-exertional crouching or climbing, and that no one else discussed Salon's assessment with Fridman.

2. Fridman also submitted newspaper articles and the transcript of a City Council hearing all post-dating the events underlying this action by a year or more, where the out-of-court speakers were neither under oath nor making admissions against their interests, regarding employability assessments. These materials are hearsay testimony under Fed.R.Evid. 402 and, as such, are inadmissible on a motion for summary judgment. See Fed.R.Civ.P. 56(e). The Court also disregards those portions of the Rosemin and Bradley affidavits that are not based on personal knowledge. Fed. R.Civ.P. 56(e); see also Wahad v. Federal Bureau of Investigation, 179 F.R.D. 429 (S.D.N.Y.1998). Further, the Court notes that Fridman failed to take his discovery obligations seriously when he failed to identify witnesses clearly covered by interrogatory requests and later refused to make such witnesses available for deposition on the grounds that discovery has closed. The effect of Fridman's conduct was to evade the very purpose of the Federal Rules of Civil Procedure.

After the examination, Fridman, along with Zlotnikova, met with Norma Claxton (hereinafter "Claxton"), an OES caseworker. Claxton, considering Salon's medical assessment and Fridman's geographic location, consulted a computer database of available work assignments and assigned Fridman to work as a maintenance worker at the Kingsboro Psychiatric Center, Brooklyn, NY. The assignment entailed 67 hours of light duty every two weeks beginning in July 15, 2000. During this meeting, Claxton also gave Fridman a Notice of Employability and Right to Contest form, which informed Fridman of his right to a fair hearing and set forth the procedures by which Fridman might avail himself of a conference or fair hearing on the issue of his employability. In particular, the written notice stated that:

> If you request a fair hearing WITHIN TEN (10) DAYS of the effective date of this notice you will not have to comply with the employment related requirements as outlined above, even if the requirements were assigned to you before you decided to request a hearing, unless and until a fair hearing is issued which finds you employable . . . .

(Kaufman Decl., ¶ 22, Ex. T.) Fridman signed this document, thereby indicating that he had reviewed the requirements with his caseworker.

Nevertheless, Fridman alleges that Claxton did not accurately review with him the provisions of the written notice. In particular, Fridman asserts that Claxton contradicted the written notice when she "knowingly and falsely told Fridman that even though he could appeal the determination that he was employable, he would lose his welfare benefits if he did not comply with his work requirement" in the in-

terim. (Plaintiff's Memorandum of Law in Opposition to Motion for Summary Judgment (hereinafter "Pl.'s Mem."), at 7.) Furthermore, Fridman asserts that Claxton, annoyed by Zlotnikova's questioning regarding Fridman's rights, threatened to call a security guard and then called for a Russian language interpreter who confirmed Claxton's statement. (Plaintiff's Rule 56.1 Statement ¶¶ 47, 12; Fridman Dep., at 545–49, 737–42; Zlotnikova Dep., at 102–05, 118, 120–23.) Claxton did not recall this meeting, but disputed that she would have made such statements. (Claxton Dep., at 40–41.)

Fridman submitted a request to the New York State Department of Social Services (hereinafter "NYSDOSS") for a fair hearing to contest the employability determination. NYSDOSS sent Fridman a receipt, dated July 10, 1996, informing him that it had received his request and that "THE STATE COMMISSIONER HAS NOT DIRECTED THE LOCAL DISTRICT TO CONTINUE YOUR ASSISTANCE UNCHANGED PENDING THE OUTCOME OF THE FAIR HEARING DECISION ON THE . . . MEDICAL REASON/RESTRICTION ON EMPLOYABILITY" issue.[3] (Kaufman Decl., ¶ 25, Ex. W.)

Sometime prior to July 15, 1996, Fridman received notice by mail switching his WEP assignment to cleaning trucks at a City Department of Sanitation garage in Manhattan. On or about that date, Fridman appeared for the orientation session for his new WEP assignment as scheduled, because he feared loss of his City public benefits if he had not. Following orientation, Fridman appeared for work at that assignment and worked approximately 39

---

**3.** Fridman has not brought suit against the New York State Commissioner, or New York State.

hours through July 26, 1996, the last day the Department of Sanitation records indicate he reported for work.[4]

On August 3, 1996, Fridman felt chest pain while walking in a park with Zlotnikova. His condition worsened, and, on August 5, 1996, Fridman was admitted to Victory Memorial Hospital. Fridman stated that he suffered a heart attack. (Fridman Dep., 781–82; Goldberg Aff., ¶ 7, Ex. C; Clark Aff., ¶ 18, Ex. P.) The physicians' records do not clearly identify the coronary event as a heart attack, but, it is clear that Fridman experienced some forms of heart disease at that time, and allegedly continues to suffer from heart disease. (Goldberg Aff., ¶ 5, Ex. B; Clark Aff., ¶ 18, Ex. P; Fridman Dep., at 781–82.)

Fridman alleges that, as a result of his treatment at the hands of HSS and the City, he experienced some type of adverse coronary event and now suffers from depression, sexual dysfunction, and possibly an increased risk of heart attack. However, he has not suffered any pecuniary loss: Fridman's public assistance benefits continued uninterrupted until Fridman became eligible for Supplemental Security Disability payments based on his coronary event and condition; Fridman's Medicaid and food stamp benefits were never reduced; only Fridman's cash allowance was reduced due to Zlotnikova's income from her own job. Finally, the fair hearing on Fridman's employability assessment that Fridman requested came up for consideration on May 28, 1998. As Fridman was already receiving Social Security Disability benefits, he considered the issue moot, and it appears that he did not attend.

4. Fridman alleges that he worked on two other dates, July 29 and August 1, 1996. While it is unclear precisely how many hours Fridman worked between July 15 and August 5, 1996,

## II. DISCUSSION

### A. STANDARD OF REVIEW

Summary judgment is appropriate only when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" containing facts that would be admissible in evidence demonstrate an absence of any genuine issue of material fact and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) & 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To support a granting of the motion, a court must determine from the record before it that a reasonable trier of fact would not be able to find in favor of the non-mover. See Brady v. Colchester, 863 F.2d 205, 211 (2d Cir.1988). In considering the motion, the evidence is viewed in the light most favorable to the non-moving party, and reasonable inferences and factual conflicts are resolved in his favor. See Cruden v. Bank of New York, 957 F.2d 961, 975 (2d Cir.1992).

However, when a party moves for summary judgment and documents his motion by setting forth specific facts denying the claims against it, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment."); Williams v. Smith, 781 F.2d 319 (2d Cir. 1986).

(Kaufman Decl., ¶ 27, Ex. Y; Fridman Dep., at 380–82, 564), this factual dispute is not material and does not affect the outcome of the legal issues discussed below.

## B. *VIOLATION OF 42 U.S.C. § 1983*

To maintain a cause of action under 42 U.S.C. § 1983, a plaintiff must show that he suffered a violation of a constitutional right and that the violation was committed under color of state law. *See* 42 U.S.C. § 1983; *Hadges v. Yonkers Racing Corporation*, 918 F.2d 1079, 1081 (2d Cir.1990).

### 1. *Action Taken Under Color of State Law*

■ The first ground for summary judgment asserted by HSS and Salon is Fridman's failure to show that their conduct constituted state action, that is, that it was accomplished under color of state law. Fridman asserts that HSS, as a contractor, had a symbiotic relationship with the City, and performed a governmental job, thus rendering HSS a state actor and Salon's conduct in assessing Fridman's employability state action under 42 U.S.C. § 1983. The Court finds that, on the record before it, Fridman's argument is too tenuous to prevail.

Traditionally, a defendant must have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law for its conduct to constitute state action under 42 U.S.C. § 1983." *See West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Accordingly, a private entity's conduct may become so entwined with governmental policies, or so impregnated with a governmental character as to become subject to 42 U.S.C. § 1983. *See Kia P. v. McIntyre*, 235 F.3d 749, 755–57 (2d Cir.2000) (holding that to the extent that private hospital acted in furtherance of a child welfare statute, and not medical considerations, it may be held liable under 42 U.S.C. § 1983). The existence of a contractual relationship, alone, does not render a private contractor's conduct state action. *See Rendell–Baker v.*

*Kohn*, 457 U.S. 830, 841, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982); *Atkinson v. B.C.C. Associates, Inc.*, 829 F.Supp. 637, 646 (S.D.N.Y.1993). The Supreme Court has articulated two tests to determine whether a private actor's conduct constitutes state action: a sufficiently close nexus and a symbiotic relationship. *See Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982); *Hadges*, 918 F.2d at 1079.

Whether a regulatory scheme subjects private conduct to § 1983 liability is properly evaluated under the sufficiently close nexus standard. *See Hadges*, 918 F.2d at 1082 (citing *Jackson*, 419 U.S. at 351, 95 S.Ct. 449). The sufficiently close nexus test analyzes whether the state can be fairly held responsible for private conduct by virtue of the ties between the state and private actor. *See Blum*, 457 U.S. at 1004–1006, 102 S.Ct. 2777.

In *Blum*, private physicians and nursing homes determined that plaintiffs, recipients of Medicaid assistance, did not need the level of care they were receiving and transferred them to a nursing home offering a lower level of care. New York City Medicaid administrators prepared to reduce plaintiffs' Medicaid benefits in response to and proportionate with the transfer. Plaintiffs sued, alleging a violation of the due process clause of the Fourteenth Amendment. Plaintiffs argued that because the nursing homes and physicians were extensively regulated, and required to complete and submit Medicaid forms in order to obtain payment for services, and would be penalized for failing to discharge or transfer patients who warrant a lower level of care, their conduct constituted state action. *See id.* at 1008–10, 102 S.Ct.

2777. The Supreme Court disagreed, reasoning that the transfer decisions "ultimately turn[ed] on medical judgments made by private parties according to professional standards that are not established by the State." *Id.* at 1008, 102 S.Ct. 2777. Furthermore, the Supreme Court did not find that the kind of decisions traditionally and exclusively made by the sovereign for and on behalf of the public encompassed the day-to-day administration of nursing homes. *See id.* at 1012, 102 S.Ct. 2777.

Likewise, in the case at bar, although HSS doctors are instructed by the Contract to make certain tests on each applicant, the ultimate employability assessment comes after an independent examination by the physician and is based on the physician's professional judgment which is not governed by state law. That HSS acted under contract with the City does not render its actions "state function" because, just as the daily administration of a nursing home, so, too, medical evaluations of employability fall outside the powers traditionally and exclusive exercised by a sovereign. Indeed, HSS's argument against finding a sufficiently close nexus is stronger than obtained in *Blum* because in the instant case there are no penalties or incentives based on the physician's assessment as employable or not. In contrast, the nursing homes in *Blum* would be penalized pursuant to state regulations for providing a higher level of care to a patient than authorized by the state. *See Blum,* 457 U.S. at 1008–10, 102 S.Ct. 2777.

Fridman's reliance on *Coleman v. Town of Hempstead,* 30 F.Supp.2d 356 (E.D.N.Y. 1999), is unavailing because the medical laboratory there was engaged to perform specific tests at the town's behest which did not involve the exercise of professional judgment. Here, however, the challenged conduct involved Salon's expertise and professional judgment as a physician. Accordingly, Fridman's case is closer to, and the analysis is more appropriately conducted following, *Blum.*

Likewise, Fridman's reliance on cases in which private actors undertook to make federal drug-testing regulations a condition of employment are factually inapposite to the case at bar, and do not advance his legal argument. *See, e.g., Drake v. Delta Airlines, Inc.,* 923 F.Supp. 387, 395–96 (E.D.N.Y.1996), *dismissing compl.,* No. 94 Civ. 5944, 1997 WL 397498 (E.D.N.Y. July 10, 1997), *aff'g, and vacating on other grounds,* 147 F.3d 169 (2nd Cir.1998). In *Drake,* the plaintiff sought damages on the theory that Delta Airlines was acting under color of state law when it conducted drug tests pursuant to mandatory federal regulations and terminated him on the basis of the drug test results. *See Drake,* 923 F.Supp. at 393–96. The district court found that Delta was "deputized" when acting pursuant to mandatory and permissive regulations by requiring employees to provide specimen for drug testing purposes and sending the specimen to a laboratory for analysis, and it analyzed Delta's actions under the Fourth Amendment. *Id.,* at 396–7. The district court ultimately rejected plaintiff's argument that regulations transformed Delta's subsequent employment decision into state action as an "impermissible expansion of due process rights" and dismissed the complaint. *Drake,* 1997 WL 397498 at *4. The Second Circuit affirmed the district court's decisions regarding state action. *See Drake,* 147 F.3d at 170–71.

The case at bar is distinguishable because HSS's role was to conduct tests and medical examinations pursuant to a contract with the City, not to implement federal regulations as Delta did. HSS's role

is more like the laboratories to which Delta sent specimens for analysis, actions that were not at issue in *Drake*. Furthermore, HSS is not involved in the WEP assignment process or in any of the other processes that follow after an employability assessment examination. Accordingly, that Delta was found to be acting under color of state law when it followed federal drug-testing regulations does not mean that HSS's conduct at issue here constitutes state action.

The symbiotic relationship analysis is designed to assess whether a private entity acts as a "joint participant" with the state, and therefore should be subject to Constitutional limitations. *See Hadges*, 918 F.2d at 1081. In *Hadges*, plaintiff attempted to show that a racetrack was a state actor based on the pervasive presence of the state by collecting a tax on admission, regulating the price of admission, supervising the betting windows and licensing all track personnel from the vendors to the veterinarians. *See id.* at 1081–82. But these fiscal and regulatory links failed to bring the racetrack into the purview of *Burton*, 365 U.S. at 725, 81 S.Ct. 856, in which § 1983 liability was imposed on a restaurant owner who refused to serve an African–American man. There the restaurant owner leased space from the state and the state had a financial interest in the restaurant's success. *See id.* In *Hadges*, the state lacked a proprietary interest in the racetrack, and the racetrack was developed and maintained by private funds. The Second Circuit held that the ties between state and racetrack were too attenuated for the imposition of Constitutional requirements on the racetrack. *See id.* at 1082.

Here, as in *Hadges*, no proprietary interest is held by the City in HSS. The success of HSS depends on its ability to perform the Contract, as well as its contracts with private entities. HSS is paid for the services it performs for applicants for exemption as referred to it by the City, regardless of whether a physician assesses the applicant to be employable or not. This suggests that the City's pecuniary interests and HSS's interests do not coincide. Although the HSS physicians make the medical employability determinations and the City routinely accepts the findings, the ultimate decision of whether or not to employ, and how to employ, is made solely by the City and entails an administrative appeal process in which HSS plays no further role. Neither does HSS's and OES's maintenance of offices in the same building establish the degree of joint enterprise that existed in *Burton*.

Similarly, the existence of the conference and fair hearing procedures fails to show that a symbiotic relationship exists: the state has not completely delegated its authority to make employability determinations. Finally, that the State of New York licenses the physicians does not render them subject to Constitutional limitations. Such a rule would render essentially all medical care state action and would bring all medical malpractice actions into the purview of 28 U.S.C. § 1331 (federal question jurisdiction). For the foregoing reasons, the Court finds that the conduct of Salon and HSS is private action, and consequently Fridman's claim for damages under 42 U.S.C. § 1983 against HSS and Salon is dismissed.

## C. *DEPRIVATION OF A CONSTITUTIONAL RIGHT*

### 1. *Failure to Identify a Violation of a Constitutional Right*

Fridman's complaint and opposition papers assert a violation of a constitutional right in general terms. No explicit right is identified by Fridman; rather, Fridman asserts without specificity a loss of proper-

ty and liberty interests protected by the Fourteenth Amendment of the United States Constitution. Defendants assert, by legal argument and evidentiary submissions, that Fridman has not identified a constitutional right, or its violation. In his opposition papers, Fridman articulates the constitutional right at issue to be that of a disabled person to be free from compelled work beyond his physical limitations. (Pl.'s Mem., at 7.) Although Fridman cites, as support for his theory, a the line of cases establishing a property interest in the continued receipt of welfare benefits, significantly, Fridman admitted that he suffered no loss of benefits. Thus, it appears that the only right allegedly violated by the City and Hammons, is a due process liberty interest, articulated above, to be free from state-mandated overly strenuous work assignments that may pose a threat to life.

Where another express provision of the Constitution serves as "an explicit textual source of constitutional protection" a court must assess a claim under that provision and not pursuant to the "more generalized notion" of substantive due process. *See Kia P.*, 235 F.3d at 757–58 (citing *Conn v. Gabbert*, 526 U.S. 286, 293, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999)). Due process rights under the Fourteenth Amendment tend to elude precise definition. *See id.* (citing *Lassiter v. Department of Social Servs.*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)). To determine whether a due process liberty interest exists, a court must look to the right allegedly deprived. *See Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). In its examination, a court may be informed by the existence of mandatory statutory language. *See id.* at 483–84, 115 S.Ct. 2293 (elaborating on *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) and *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). The essential purpose of due process rights is to protect the citizenry against arbitrary state actions. *See Kia P.*, 235 F.3d at 758 (citations omitted).

Case law has established that liberty interests under the Fifth and Fourteenth Amendments include procreation, marriage, family integrity, personal appearance, reputation, and certain freedom from certain terms of incarceration or government custody. *See, e.g., Kelley v. Johnson*, 425 U.S. 238, 244, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976); *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Runyon v. McCrary*, 427 U.S. 160, 176, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *Sandin*, 515 U.S. at 478, 115 S.Ct. 2293; *Wilkinson v. Russell*, 182 F.3d 89, 104 (2d Cir.1998). In particular, granting applicants an opportunity for a fair hearing to dispute employability determinations, without any disruption of benefits during that dispute process, appears to satisfy the U.S. Constitution protections for property interests. *See Aguayo v. Richardson*, 473 F.2d 1090, 1108–10 (2d Cir.1973).

Here, the right Fridman alleges is supported by statutory language. According to both federal and state enactments, those who are ill, incapacitated or of advanced ages are to be exempt from any work assignment in the WEP program. *See* 42 U.S.C. §§ 602(a)(19)(C)(i), 607(b)(1)(B)(v); N.Y.S.S.L. § 332(1)(a).[5] These enact-

---

**5.** Fridman cites case law following *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), as supporting the creation of his liberty interest. These cases establish a property interest in the continued receipt of benefits, but do not clearly support the liberty interest he articulates as "freedom from compulsory labor that exceed[s] [a welfare recipient's] physical capabilities." (Pl.'s Mem., at 15.) Further, the case that Fridman

ments reflect the grave risk to life should a person be compelled by the state to engage in work that exceeds his physical limitations or that is incompatible with a serious medical condition. As the right articulated by Fridman arises out of the abiding liberty interest of life, in the abstract, the Court might be inclined to find that a right exists of disabled persons to be free from state-compelled overly strenuous work assignments that contravene documented medical conditions and thus may pose significant threats to life. Even if, in theory, there may be some legal support for the right claimed by a plaintiff, to survive summary judgment a plaintiff must also show a violation of that right.

### a. *Intentional Deprivation*

The unauthorized intentional deprivation of rights protected by the Fourteenth Amendment does not constitute a violation of the due process clause if meaningful post-deprivation remedies are available under state law. *See Hudson v. Palmer*, 468 U.S. 517, 532–33, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) ("For intentional, as for negligent deprivations of property by state employees, the state's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy."); *Hellenic American Neighborhood Action Committee v. City of New York*, 101 F.3d 877 (2d Cir.1996) (as a matter of law, the existence of a remedy available after an alleged deprivation means there can be no due process violation); *Stuto v. Fleishman*, 164 F.3d 820 (2d Cir.1999) (as a matter of law, there is

no 42 U.S.C. § 1983 violation where a menu of remedies is available after the termination of disability benefits).

■ However, where it is shown that municipal employees purposefully made oral misrepresentations of applicants' rights in order to reduce the number of fair hearings, or otherwise interfered with procedural due process mechanisms, a due process violation occurred. *See Reynolds v. Giuliani*, 35 F.Supp.2d 331 (S.D.N.Y. 1999); *see also Rauccio v. Frank*, 750 F.Supp. 566 (D.Conn.1990). To amount to such a "custom or usage" under 42 U.S.C. § 1983, a plaintiff's evidence must establish the "settled practices of state officials" which thereby have the "force of law." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 163–68, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *see also Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A single act may be sufficient to show a policy, but only if accomplished by an authorized, policy-making official. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Moultry v. City of Poughkeepsie*, 154 F.Supp.2d 809, 813–14 (S.D.N.Y.2001).

■ Defendants argue that to the extent Fridman is alleging an intentional deprivation of a liberty interest, he must show that there existed no meaningful post-deprivation remedies, which Fridman cannot show. As the written notices provided to Fridman indicate, Fridman had rights to contest the employability determination by requesting a conference or a

cites, *Moore v. Perales*, 692 F.Supp. 137 (E.D.N.Y.1988), as direct support for his statement that "the recipient of benefits nonetheless has a liberty and property interest in assuring that all work mandates and conditions imposed on his benefits are applied in accordance with both procedural and substantive due process" is quite nearly its anti-

pode. In *Moore*, the question was whether a municipality's failure to comply with time limits set by federal statute constituted a deprivation of due process (which the court answered in the negative, so long as there is substantial compliance), not whether there was a liberty interest at issue. *See id.*, at 142–43.

fair hearing and to the continuing receipt of his benefits without attending a work assignment pending a fair hearing, as required under New York laws. *See* N.Y.S.S.L. §§ 22.12, 332; 18 N.Y.C.R.R. 358–3.1—3.6; *see also Sawma v. Perales,* 895 F.2d 91, 93 (2d Cir.1990) (citing *Goldberg v. Kelly,* 397 U.S. 254, 266, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)). Indeed, there were at least two appeal procedures available to Fridman. He could request a conference and/or a fair hearing. Fridman did request, and was scheduled for, a fair hearing. According to Fridman, the fair hearing was rendered moot by virtue of his becoming eligible for disability benefits.

Again, Claxton's statements to Fridman contradicting statutory provisions were unauthorized by law, as Claxton admits. (Claxton Dep., at 39,41; *see generally* N.Y.S.S.L. §§ 22.12, 332; 18 N.Y.C.R.R.

§§ 358–3.1, 358.3.6.) Furthermore, Claxton was not authorized ·to make policy for OES or the City. (Kaufman Decl., ¶ 6, Ex. D.) Thus, the factual pattern adduced by Fridman does not show interference with his due process rights: Fridman was given incorrect information by Claxton, which was belied by the written notice the City provided to him during the meeting with Claxton.

■ To make Claxton's statements actionable under 42 U.S.C. § 1983, therefore, Fridman must establish they were made pursuant to an unconstitutional City policy or practice. However, Fridman does not adduce facts that there was a policy or practice at the City whereby caseworkers, in order to interfere with fair hearing rights, falsely informed applicants to attend work assignments despite the pending fair hearing.[6] Fridman has not met

---

**6.** Fridman has requested the Court take judicial notice of two state law opinions, *Santana v. Hammons,* 177 Misc.2d 223, 673 N.Y.S.2d 882 (1998), *mod. sub nom. Mitchell v. Barrios–Paoli,* 253 A.D.2d 281, 687 N.Y.S.2d 319 (1999) (hereinafter "State Opinions"), that he purports establish "the failure of HSS physicians appropriately to consider medical histories, actual conditions presented or medical documentation submitted, as well as the failure of HRA caseworkers to inform applicants for exemption of their rights to appeal, or their rights while their appeal is pending." (Goldberg Aff., ¶ 16.) Again, the Court will not consider the conduct of HSS and its employees alleged by Fridman because it does not constitute state action; of course, the Court will address the claims asserted against the City based on its employees' conduct.

A federal court must take judicial notice of adjudicative facts upon the request of a party if supplied with the information that the fact is not subject to reasonable dispute and is either generally known in the jurisdiction or capable of accurate and ready determination. *See* Fed.R.Evid. 201. Here, the text and existence of the State Opinions is not in dispute and are capable of ready and accurate determination. *See Jacques v. U.S. R.R. Retirement*

*Bd.,* 736 F.2d 34, 40 (2d Cir.1984); *17 Vistas Assocs. v. City of New York,* No. 95 Civ. 3870, 1996 WL 197762, *3 (S.D.N.Y. April 23, 1996) ("[S]tate court opinions may properly be considered pursuant to Rule 201, Fed.R.Evid."); *Commonwealth of Pennsylvania v. Brown,* 373 F.2d 771, 778 (3rd Cir.1967). Nevertheless, the Court's notice of the State Opinions does not advance Fridman's case. The facts are not similar to Fridman's case because the plaintiffs in the State Opinions had attended fair hearings and the bulk of the allegations concerned misconduct at those hearings, and termination of benefits. Legally, the question in the State Opinions was whether the City "habitually assigns [public assistance recipients classified as employable with limitations] to job assignments incompatible with their disabilities, leading to the loss of benefits without due process." *Mitchell,* 687 N.Y.S.2d at 321. Thus, factually and legally, the conduct of OES caseworkers was less significant to the State Opinions than it is here. In addition, the legal question at issue in the State Opinions concerned the issuance of a preliminary injunction, which raises different issues from those raised by a motion under Fed. R.Civ.P. 56. Accordingly, even if a preliminary injunction is issued, the factual findings

his burden under Fed.R.Civ.P. 56(e). Therefore, although Fridman's confusion, and subsequent medical treatments, is regrettable, it is not actionable under 42 U.S.C. § 1983 as an intentional deprivation.

### 2. Negligence is not Actionable as a "Deprivation" Under 42 U.S.C. § 1983

The City also bases its motion for summary judgment on the theory that the conduct at issue does not rise to the level required for the imposition of liability of 42 U.S.C. § 1983.[7] Fridman argues that Claxton made her statements "knowingly and falsely," but he provides no evidentiary support for this statement. (Pl.'s Mem., at 7.) The City proposes that even if Claxton made such a statement, at best it was negligent and therefore not cognizable under 42 U.S.C. § 1983. Fridman opposes summary judgment on this ground by asserting that there is an unconstitutional pattern, practice, accepted procedure or custom by the City, which violated Fridman's liberty interest in freedom from compulsory labor that exceeded his physical capacities.[8] Assuming that Fridman has alleged a liberty interest protected by the United States Constitution, and that his case falls within its purview, he has failed to adduce sufficient facts to satisfy his burden under Fed.R.Civ.P. 56(e) establishing a "deprivation" thereof.

"To establish a violation of the due process clause of the Fourteenth Amendment, a plaintiff must show that the defendant 'deprived' him of life, liberty, or property, a concept clearly satisfied by intentional conduct but clearly not satisfied by conduct that is merely negligent." *Dodd v. City of Norwich*, 827 F.2d 1, 3 (2d Cir. 1987) (citing *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) and *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986)). To impose § 1983 liability where there has been no affirmative abuse of power "would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States." *Daniels v. Williams*, 474 U.S. 327, 333, 106 S.Ct. 677, 88 L.Ed.2d 662 (1986).

---

are not conclusively established. Finally, the State Court's finding that the plaintiffs' claims were not so similar to warrant class certification suggests that the prior litigation did not show a custom or usage among OES case workers to interfere with applicants' fair hearing rights. In light of the foregoing analysis, the Court does not find, or identify a material question of fact regarding, a policy, practice, custom or usage based on the existence of, or factual findings contained in, the State Opinions.

7. Fridman withdrew his claims against Hammons in her individual capacity. (Kaufman Decl., ¶ 3, Ex. B, at 34–36.)

8. The allegedly unconstitutional pattern, practice, accepted procedure or custom includes "failing independently to review the findings and classifications of [HSS] with respect to medical evaluations, failing to make job assignments appropriate to the physical ability of applicants who have been medically evaluated, assigning said applicants to WEP jobs that are too strenuous for them vis-[a]-vis their physical ability, failing to inform applicants who have been medically evaluated of either their work classification, the tasks for which they were cleared, or the medical findings underlying them, willfully misleading applicants to believe that they will lose all of their benefits if they do not report to their WEP assignments even where the applicant makes a timely request for a fair hearing, and compelling physically ill or disabled WEP participants to undertake tasks which have led, or will lead, to severe physical injury or death." (Plaintiff's Rule 56.1 Statement ¶ 27.) In sum, Fridman's conceptualization of due process would require legal notices to be provided orally and in writing, and a second medical opinion be issued to every applicant for exemption.

At the same time, negligent acts by a municipal employee may rise to the level of "deprivation" under specific circumstances. Potentially, an official policy or custom may be inferred from a municipality's failure to act as well as from positive actions. But such an inference is inappropriate absent evidence that a policy exists or that an official authorized to make policy participated in the act. *See Turpin v. Mailet*, 619 F.2d 196, 201 (2d Cir.), *cert. denied*, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980); *see also Gibralter v. City of New York*, 612 F.Supp. 125, 131 (E.D.N.Y.1985).

Fridman has not made a showing sufficient to survive Defendants' motions and supporting affidavit evidence. Even taking his allegations as true, at best Fridman has alleged that Claxton, a municipal employee who lacked policy-making authority, misstated his rights to contest his employability classification and contradicted the written notice provided pursuant to City regulations. Fridman attempts to show an unconstitutional custom or usage by submitting the affidavits of two other men who state that, after receiving a cursory examination by an HSS physician, they were not informed of either the physician's employability determination or their rights to request a fair hearing by the OES caseworker. However, Fridman adduced no admissible evidence showing that these incidents were brought to the attention of a supervisory City employee or a policy-making employee prior to Fridman's July 2, 1996 examination.[9]

In sum, under any theory suggested by Fridman, he can adduce no set of facts sufficient to establish a *prima facie* case required under 42 U.S.C. § 1983. Accordingly, the fact that HSS and the conduct of Salon and Claxton allegedly confused, or had negative repercussions on, Fridman is not actionable under 42 U.S.C. § 1983, and Fridman's claim must be dismissed.

## D. *STATE CAUSES OF ACTION*

■ Fridman withdrew his 42 U.S.C. § 1985 claims. (Kaufman Decl., ¶ 3, Ex. B, at 21.) Fridman also withdrew his 42 U.S.C. § 12133 claims and medical malpractice claims. (Pl.'s Mem., at 3.) HSS and Salon note that the remaining state law claims were before the Court based on supplemental jurisdiction, and, where the basis for pendent jurisdiction is dismissed so should the state-law claims be dismissed. 28 U.S.C. § 1367(c); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Federman v. Empire Fire and Marine Ins. Co.*, 597 F.2d 798, 809–11 (2d Cir.1979). As the Court has dismissed the 42 U.S.C. § 1983 claim against HSS and Salon, and noted Plaintiff's abandonment of his other federal claims, there is no longer any basis for supplemental jurisdiction of the state law claims. Accordingly, the Court dismisses the remainder of Fridman's complaint.[10]

---

**9.** See discussion *supra,* at n. 5.

**10.** While the Court finds it unnecessary to reach Fridman's state claims, to the extent that Fridman opposed summary judgment on his claims of negligence against HSS and Salon, the Court observes that under New York law a claim of negligence is "restricted to those cases where the alleged negligent act is readily determinable by the trier of facts on common knowledge", *Hale v. State of New York*, 53 A.D.2d 1025, 386 N.Y.S.2d 151, 152 (1976) (citations omitted), and does not include those cases, as here, where the conduct at issue involved "a matter of medical science or art requiring special skills not ordinarily possessed by lay persons." *Richner v. Smithkline Beecham Clinical Labs*, No. 96 Civ. 2523, 1996 WL 432473, at *2 (S.D.N.Y. Aug. 1, 1996) (citations omitted). As such, because Fridman's negligence claims challenge the testing practices, medical judgments and independent evaluations of HSS and Salon, the

### III. *ORDER*

Accordingly, for the foregoing reasons it is hereby

**ORDERED** that the motion for summary judgment by defendants H.S. Systems, Inc., and Aurelio Salon, Jr., M.D., is GRANTED; and it is further

**ORDERED** that the motion for summary judgment by defendants the City of New York and Marva Livingston Hammons' is GRANTED; and it is finally

**ORDERED** that the Clerk of the Court dismiss the complaint and close this case.

**SO ORDERED.**

Court would be disposed to dismiss it. Further, Fridman did not oppose Defendants' motions for summary judgment on his breach of contract claims.