OPINION OF THE COURT
Richard M. Platkin, J.
This is a motion brought pursuant to CPLR 901 for certification of this matter as a class action and recognition of the named plaintiffs as class representatives. The action seeks relief based on alleged violations of the Labor Law committed by defendant against hourly workers at the 92 Wal-Mart and Sam’s Club stores located in New York State.[1] This lawsuit mirrors dozens of actions commenced in recent years in sister states against this same defendant. All of these actions involve allegations of similar misconduct.
According to plaintiffs’ second amended complaint, as amplified by their submissions filed in support of the present motion, defendant systematically deprived hourly workers (known as associates) of wages through a variety of unlawful practices. Plaintiffs contend that defendant routinely understaffed its stores and, in order to make up for this deliberate shortage of workers, required associates to work through their earned rest breaks and lunch periods in order to complete assigned tasks. Additionally, associates were said to have been required to work without compensation “off the clock” either before their shifts began or after their shifts had ended.
Plaintiffs further contend that, as an additional illegal cost-cutting measure, defendant’s management personnel routinely *846 falsified associates’ computerized time records. If an associate, for example, failed for any reason to “swipe out”[2] at the end of a shift, a manager would electronically insert a fictitious entry that would reflect on the company’s payroll records that the associate had “swiped out” one minute after the shift had begun, thereby depriving the associate of earnings for that shift. Another alleged practice involved the posting of overtime hours onto a subsequent week’s payroll as regular earnings in order to deprive the associate of the time-and-one-half premium pay to which she was legally entitled. Yet another complaint lodged was that management would insert unpaid meal periods of up to one hour into an associate’s time records even if that associate had worked the full shift without having taken a meal break.
In addition, plaintiffs allege that defendant violated a number of regulatory minimum wage orders of the state administrative code relative to “call-in,” “split shift” and “spread shift” pay. “Call-in” pay refers to the mandate of 12 NYCRR 142-2.3 that a worker receive at least four hours’ pay at the minimum wage if called in to work on a given day; “split shift” pay is a mandatory additional payment under 12 NYCRR 142-2.4 equal to one hour’s pay at the minimum wage when the hours of a given shift are not consecutive; and “spread shift” pay is an additional hour’s wage mandated by 12 NYCRR 142-2.4 when a given shift exceeds 10 hours in length. According to plaintiffs, defendant routinely deprived associates of these entitlements.
*847 Initially, four plaintiffs, all former hourly associates who had worked for defendant in New York, commenced this litigation. Following joinder of issue but prior to her being deposed by defendant’s counsel, plaintiff Maria Gamble withdrew from the action. By decision and order dated June 29, 2006, this court (McCarthy, J.) granted defendant’s motion for summary judgment against plaintiff Marianne Witkowski on the ground that she lacked capacity to sue due to her failure to have listed her interest in this litigation on a bankruptcy petition filed just two months after commencement of this action. Remaining in the lawsuit at this time, then, are coplaintiffs Bryan Alix and Joyce L. Daniels.
The June 29, 2006 decision and order also granted defendant’s motion for summary judgment as to the fourth, fifth and sixth causes of action in the second amended complaint, as well as partial summary judgment on the second cause of action. In brief, various causes of action predicated upon breach of contract theories were dismissed in the absence of evidence of any employment contract between plaintiffs and defendant. Additionally, the causes of action based upon alleged violations of the regulatory minimum wage orders were dismissed in the absence of a factual issue as to whether the compensation actually received by plaintiffs for call-in, split and spread shifts was less than the total amount that would have been due based upon the minimum wage.[3] What remains in this lawsuit, therefore, is one cause of action arising under article 6 of the Labor Law for defendant’s alleged failure to have paid plaintiffs earned wages and one cause of action arising under article 19 of the Labor Law for defendant’s alleged failure to have paid time and one half for work in excess of 40 hours in any given week.
Plaintiffs now move to certify this matter as a class action. There are five prerequisites to class action certification (CPLR 901 [a] [l]-[5]). The ultimate determination is discretionary, and the burden of proof lies with plaintiffs to show that the prerequisites have been met (Beller v William Penn Life Ins. Co. *848 of N.Y., 37 AD3d 747 [2d Dept 2007]; Casey v Prudential Sec., 268 AD2d 833, 834 [3d Dept 2000]). The statutory criteria will be addressed seriatim.
1. Numerosity/Class Definition
The first statutory prerequisite to class action certification is that the class be “so numerous that joinder of all members . . . is impracticable” (CPLR 901 [a] [1]). In this case, plaintiffs have defined the proposed class as consisting of all persons who were “hourly employees ... in the State of New York at any time on or after August 9, 1995 . . . whether employed in WalMart stores, SuperCenters, or Sam’s Club stores” (second amended class action complaint at 1, para 1). The parties estimate that this proposed class includes approximately 200,000 members as of the date of oral argument on plaintiffs’ motion for class certification (May 17, 2007). The proposed class would therefore appear to meet the initial test of numerosity.
The analysis of this particular prerequisite is not nearly so straightforward, however. It is settled law in New York that the numerosity requirement can only be met by a proposed class of individuals who have been aggrieved by the conduct forming the basis of the complaint (see Batas v Prudential Ins. Co. of Am., 37 AD3d 320, 321 [1st Dept 2007], citing Maio v Aetna, Inc., 221 F3d 472 [3d Cir 2000] [additional citations omitted]). It is obvious from the record developed to this point in the litigation that not each and every individual who was ever an hourly employee of defendant during the relevant time period worked without pay, nor was every hourly employee deprived of premium pay for overtime hours. Indeed, the record contains more than four dozen affidavits and deposition testimony from present and former employees of defendant who not only deny having themselves been subjected to this illegal treatment, but who further deny knowing of any other hourly employees being thus treated. It is therefore apparent that the class proposed by plaintiffs, however large that group may be, includes numerous individuals who have no colorable claim of having been aggrieved by the conduct alleged in plaintiffs’ complaint.
The untenable overbreadth of plaintiffs’ proposed class can also be seen from reasonable inferences drawn from the record developed on this application. Plaintiffs assert that the goal of this lawsuit is to provide the aggrieved hourly associates “a means to get paid for their work” (plaintiffs’ mem of law at 2). One of the primary instruments proposed by plaintiffs to accomplish this end is the expert analysis of defendant’s computer *849 time records. Plaintiffs’ expert avers that he has identified evidence of some 31,000 instances in which defendant inserted unpaid meal breaks into the time records of associates over the 2x/2-year period that he examined. Plaintiffs’ expert also contends that he has found evidence of 36,000 instances in which associates were deprived of up to an entire shift’s pay through the implementation of “one-minute punch-outs” inserted by management. The expert’s submissions also show up to 164,000 hours of overtime work that was not paid at time and one half. Viewing this evidence in a light most favorable to plaintiffs and assuming that it demonstrates an entitlement to full recovery for every such irregularity claimed, the dilution of the pool of aggrieved potential litigants as a result of the overly broad class proposed by plaintiffs would result in minuscule individual awards of damages to class members.
For example, of the 31,000 inserted meal breaks identified by plaintiffs’ expert, 54% are exactly 30 minutes long while 27% are exactly one hour long. Assuming, arguendo, that the remaining 19% of the unpaid breaks were each also a full hour long and that the affected associates were engaged in work for defendant for the entire duration of each inserted meal break, the total number of unpaid hours of labor attributable to the inserted meal breaks would be 22,630. At a hypothetical rate of pay of $10 per hour, this would be $226,300 of unpaid labor. Were this sum to be divided equally among the 200,000 members of plaintiffs’ class, each member would receive $1.13 in compensation.
A similar result follows if plaintiffs’ expert analysis of the “one-minute punch-outs” were brought to its logical conclusion. Assuming that each of the identified 36,000 “one-minute punch-outs” represents an unpaid seven-hour shift at $10 per hour, there were $2,520,000 of unpaid wages. With full recovery and equal distribution among class members, each would receive $12.60.
Finally, if the unpaid premium overtime were calculated at plaintiffs’ expert’s highest figure, 164,000 hours paid as regular wages instead of time and one half, at the hypothetical rate of $10 per hour of “straight” time, the overtime premium earned but not paid would amount to $820,000. Were that sum to be divided equally among the class members, each would receive $4.10.
*850 While the above analysis is greatly simplified for illustrative purposes,[4] it serves to demonstrate that the class proposed by plaintiffs is far too large to approximate, even remotely, the group of hourly associates who may have been aggrieved. If the allegations of the complaint are proven, $18 will hardly compensate the employees who were actually deprived of wages earned as a result of defendant’s alleged wrongful conduct. This enormous dilution, attributable to the profound misalignment between plaintiffs’ proposed class and the much smaller class of individuals who legitimately can claim to be aggrieved by the conduct forming the basis of the complaint, demonstrates that plaintiffs have failed to satisfy the numerosity prerequisite with respect to a properly defined class.
Plaintiffs assert that the calculation of the amount of damages and the task of apportioning an ultimate award of damages among the class members can be segregated from the action-in-chief, as the need for individualized treatment of damages is not in itself fatal to class action certification (see e.g. Bloom v Cunara Line, 76 AD2d 237, 241 [1st Dept 1980]). This contention, however, confuses the issue of calculating and apportioning damages with that of determining liability. Here, the question is not how much may be owing to each of the members of the proposed class; rather, the issue is whether the class consists of members who can, in good faith, assert a claim that they were injured by defendants’ alleged misconduct. Plaintiffs’ proposed class does not even come close to meeting that standard.
A defect such as this is not necessarily fatal to a motion for class certification, as it is ultimately the responsibility of the court to define the class (CPLR 903; cf. Batas, supra at 321-322; but see In re Initial Pub. Offering Sec. Litig., 483 F3d 70, 73 [2d Cir 2007] [“The Petitioners, having sought a broad class, are essentially complaining that we failed to narrow their class definition to an extent that might have satisfied Rule 23 requirements. Whatever authority we might have had to undertake that task, we did not think it appropriate to provide legal advice to experienced class action litigators”]).
Attempts at narrowing the scope of the class, however, run into a different but equally serious barrier: the requirement *851 that class membership be ascertainable on the basis of objective criteria that do not require the court to examine the individual merits of claims. By way of example, the class definition might be limited to
“all present and former hourly employees of the defendant who, at any time from August 9, 1995 until the date of trial, worked for the defendant in New York and who ever failed to receive regular compensation for work performed, or who ever worked more than forty hours in a given week without compensation at time-and-one-half the regular rate of pay for all periods of work in excess of forty hours.”
While such a definition would restrict the class to a group of individuals having viable claims against defendant, it would render the class incapable of ascertainment without the court delving into the specific details of a putative class member’s individual employment history. Where a case-by-case analysis is necessary to determine whether any given individual satisfies the requirements for class membership or where the size of a putative class is incapable of ascertainment absent such an analysis, certification of a class action is not warranted (see, e.g., Gawez v Inter-Connection Elec., Inc., 9 Misc 3d 1107[A], 2005 NY Slip Op 51443[U], *9 [Sup Ct, Kings County 2005, Lewis, J.], citing Mitchell v Barrios-Paoli, 253 AD2d 281, 291 [1st Dept 1999]; see generally Conigliaro v Norwegian Cruise Line Ltd., 2006 US Dist LEXIS 95576 [SD Fla]).
Thus, as explained, supra, plaintiffs’ proposed class definition is fatally overbroad. At the same time, the class definition cannot be narrowed to include only aggrieved individuals without concomitantly necessitating a fact-specific individualized analysis of the circumstances surrounding each potential class member’s employment with defendant. Engaging in such an exercise would frustrate the very goal of class litigation: the determination of issues affecting numerous individuals without the concurrent necessity of attempting to delve into the particular facts and circumstances of numerous, relatively small, individual claims.[5] Based on the foregoing, the court concludes that plaintiffs have failed to establish the prerequisite of numerosity on their application for class certification.
*852 In this context it bears noting that, of the nine appellate courts of sister states that have rendered decisions on the question of class certification in similar lawsuits brought against defendant, only two have approved class action certification.* [6] In Iliadis v Wal-Mart Stores, Inc. (supra, 191 NJ at 103-104, 922 A2d at 718-719), the New Jersey Supreme Court recently approved a class definition similar to the one proposed by plaintiffs in this action. In so doing, the court stated that it would be inappropriate to address defendant’s claim of overbreadth at the certification stage, explaining that the class definition could later be altered or amended to accommodate any problem. However, since New York law makes a proper class definition a component of the numerosity requirement, which is a prerequisite for certification, this court sees no basis for deferring consideration of this important issue. Further, the recent decertification decision in Massachusetts, discussed infra, strongly counsels against a “wait and see” approach.
The other appellate court to have approved class certification is the Court of Appeals of the State of Washington (Barnett v Wal-Mart Stores, Inc., 133 Wash App 1036 [unpublished op; text at 2006 WL 1846531, 2006 Wash App LEXIS 1437], review denied 160 Wash 2d 1003, 158 P3d 614 [2007]). In the Washington litigation the class was defined as consisting of
“[a] 11 current and former hourly paid employees of Wal-Mart Stores, Inc. (including Wal-Mart Stores, Supercenters and Sam’s Clubs, but excluding distribution centers) in the state of Washington who worked off the clock without compensation and/or worked through any part of a rest or meal break from September 10, 1997 through the date judgment is entered in this action and who have not held a salaried management position with Wal-Mart *853 at any time during that period” (2006 WL 1846531, *2, 2006 Wash App LEXIS 1437, *7).
Although the Court of Appeals recognized the principle that a “proposed class definition must not depend on . . . the merits of the case ... to determine who is a class member” (2006 WL 1846531, *1, 2006 Wash App LEXIS 1437, *4, citing Cook v Rockwell Intl. Corp., 151 FRD 378, 382-383 [D Colo 1993]), a determination of an element of the merits of the claim — that a given employee of the defendant worked without compensation — would nonetheless be necessary in order to identify that particular employee as a member of the class. Thus, Barnett appears to be an anomalous case whose holding is at odds with its own reasoning.
2. Predominance of Common Issues
The second prerequisite to class certification is that “there are questions of law or fact common to the class which predominate over any questions affecting only individual members” (CPLR 901 [a] [2]). This requirement of “predominance” has not been demonstrated by plaintiffs. The very nature of their claims bespeaks a need for individual treatment of the allegations of the class members. While the applicable law may well be the same for all litigants, there are as many separate fact patterns as there are present and former hourly employees who worked for defendant. The necessary resolution of factual issues arising out of the employment circumstances of these unique individuals cannot occur in thé Procrustean bed of a class action.
Plaintiffs do not contend, as indeed they cannot, that every hourly associate ever employed by defendant was required to work without pay and was deprived of premium pay for overtime work. Nor do plaintiffs claim that those associates who did work without proper compensation were deprived of wages in precisely the same manner or to the same extent. What plaintiffs allege is that defendant’s business policies, practices and objectives allowed for (and indeed may have encouraged) systematic abuses of hourly associates in order to maximize the profits of the company. While there may indeed thus be general facts common to all hourly employees, establishing defendant’s liability and determining damages will nonetheless inevitably require a specific analysis conducted on an employee-by-employee basis.
Plaintiffs contend that defendant created an atmosphere in its stores that was conducive to requiring associates to work without compensation. For example, plaintiffs point to a *854 company policy that discouraged employees from working overtime. Meanwhile, plaintiffs claim that associates were expected to complete the tasks that were assigned to them, despite a consistent company policy of understaffing stores. Caught in the dilemma of having to choose between being disciplined for working overtime and being disciplined for having failed to complete their assignments, plaintiffs allege that associates would routinely “swipe out” at the end of a shift and then return to work “off the clock” to finish their assigned tasks. Plaintiffs contend that this oppressive workplace environment, created knowingly and intentionally by management, set the stage for routine “off the clock” hours worked by associates. Similarly, pressure brought to bear by the “home office” on the local store managers is said to have spawned the practice of falsifying time records by inserting unpaid meal breaks and “one-minute punch-outs.”
While proof of this atmosphere of unrelenting pressure to cut payroll costs may be relevant, it primarily serves as a backdrop to the fact-specific inquiries that must, of necessity, occupy center stage in this litigation. In order to establish entitlement to relief, not to mention proper apportionment of damages, plaintiffs must adduce specific evidence as to which associates worked “off the clock,” on what occasions, and for how long. Moreover, plaintiffs must also demonstrate that defendant either knew or had reason to know that its employees were thus engaged (see People ex rel. Price v Sheffield Farms-Slawson-Decker Co., 225 NY 25 [1918], quoted by Reich v Department of Conservation & Natural Resources, State of Ala., 28 F3d 1076, 1082 [11th Cir 1994]). Absent such proof, plaintiffs will not have established a prima facie case of violations of the Labor Law.
Plaintiffs suggest that expert testimony might be a satisfactory substitute for individualized proof. Without a detailed explanation of their proposed methodology, plaintiffs claim that they “will be able to establish Wal-Mart’s common course of wage and hour abuse through the use of representative testimony, Wal-Mart’s corporate documents, and statistical evidence from Wal-Mart’s own records” (plaintiffs’ mem of law at 56-57). In support of this contention, plaintiffs cite to Matter of Pacis v Glass (243 AD2d 753 [3d Dept 1997]) in which the Court approved the use of statistical sampling to support a determination of Medicaid overbilling. However, Pads is inapposite to the present case, since it involved evidence adduced at an adminis *855 trative hearing and subject to review only in the limited context of a CPLR article 78 proceeding. The formal rules of evidence do not apply to administrative hearings (State Administrative Procedure Act § 306 [1]). Moreover, there is specific regulatory authority approving the use of statistical sampling and allowing consideration of extrapolations from such sampling in such cases (18 NYCRR 519.18 [g]; see also Matter of Mercy Hosp. of Watertown v New York State Dept. of Social Servs., 79 NY2d 197, 201 [1992]). Plaintiffs cite no analogous New York authority for the proposition that an expert’s opinion based upon statistical sampling can be admitted as evidence-in-chief of Labor Law violations under the rules of evidence applicable to a jury trial in Supreme Court in an action for damages.[7]
The persuasive authority of Reich v Southern New England Telecom. Corp. (121 F3d 58 [2d Cir 1997]) does not suggest a contrary result. In that case, the court approved the use of statistical sampling to prove a prima facie case of Fair Labor Standards Act violations where the employer required workers to remain on premises and perform security and other functions during their unpaid meal breaks. In sanctioning the use of statistical sampling as evidence-in-chief, the Second Circuit specifically noted that all similarly situated employees were required as a matter of uniform company policy to assume specific work-related responsibilities during their meal breaks (121 F3d at 67). As a result, there was no need for an individualized analysis, as each of the affected employees in the class was treated identically.
In the present case, the facts and circumstances surrounding the allegedly unpaid work vary substantially from associate to associate. This can be seen from the testimony of the two *856 remaining nominative plaintiffs. In his deposition, Mr. Alix claims two primary situations in which he was deprived of wages for work he performed for defendant. First, Mr. Alix contends that on many occasions, he reported to his position as a baker at 4:00 a.m., as he was required to do, but often was forced to wait outside the store for up to 20 minutes for the locked doors to be opened. He also claims to have worked off the clock during meal breaks for much of the period in which his bakery department was without a manager. The primary claim asserted by Ms. Daniels relates to assisting customers of her assigned department for brief periods, either before work, after work or while punched out on unpaid breaks. She also complains of working off the clock, from time to time, to pick up and restock items lying on the floor. Given the wide variety of factual circumstances raised by the plaintiffs’ claims, Reich v Southern New England Telecom. Corp. and similar authorities are thus inapposite to the present case.
Moreover, plaintiffs’ reliance on federal cases and secondary authority for the proposition that statistical analysis can substitute for individualized proof rests on shaky evidentiary ground. Federal courts, when determining the admissibility of expert testimony, are governed by the relaxed standard of Daubert v Merrell Dow Pharmaceuticals, Inc. (509 US 579 [1993]). Daubert, interpreting Federal Rules of Evidence rule 702, requires only that expert opinion testimony be relevant and reliable in order to be admitted to assist the trier of fact (id. at 589-590). As recently as October 2006, however, the New York Court of Appeals has reaffirmed its rejection of Daubert as the standard to be applied under our State’s evidentiary law (Parker v Mobil Oil Corp., 7 NY3d 434, 447 n 3 [2006]; cf. People v LeGrand, 8 NY3d 449 [2007]). In New York, the more stringent test of admissibility of expert opinion testimony is “whether the accepted techniques, when properly performed, generate results accepted as reliable within the scientific community generally” (People v Wesley, 83 NY2d 417, 422 [1994]; see also People v Wernick, 89 NY2d 111, 115-116 [1996]). This is the familiar Frye test (Frye v United States, 293 F 1013 [DC Cir 1923]).
Further, even if plaintiffs could overcome these formidable barriers and rely upon an expert analysis of defendant’s computer time records to prove their case-in-chief, the need for numerous, individualized, fact-specific inquiries remains. This is true for several reasons. First, while the time records may highlight potential irregularities, they do not, standing alone, *857 demonstrate that an employee worked “off the clock,” on what occasions, and for how long.[8] Thus, for example, while plaintiffs’ expert identified some 31,000 instances in which management is claimed to have inserted unpaid meal breaks, whether the employees actually were engaged in work for defendant during those periods is a question that can only be answered on an individual basis. Even with respect to the “one-minute punch-outs,” perhaps the strongest of plaintiffs’ claims, the time records may demonstrate a potential for underpayment of wages, but do not and cannot provide any insight into the magnitude of any such violations.
In any event, the computer time records and associated expert analysis would shed little, if any, light on much of the “off the clock” work claimed by plaintiffs. After all, if employees are working “off the clock,” their work is, by definition, not recorded by the time keeping system. This too is apparent from the claims of the nominative plaintiffs. Whether Mr. Alix actually was performing work for defendant during any given meal period for which he had punched himself out and whether Ms. Daniels was called upon to assist customers prior to punching in or after punching out on any given day can only be determined by individualized inquiry.
Finally, even if plaintiffs were content to present their case on an aggregated basis, defendant would insist on being provided the opportunity to offer numerous individualized, employee-specific defenses as to liability and damages. The parties disagree on whether due process would require that defendant be given such an opportunity, but certainly considerations of fundamental fairness would counsel in favor of defendant’s position.
Thus, while there may be a number of common issues shared by the putative plaintiffs, proving the essential elements of the alleged Labor Law violations will inescapably require individualized inquiry. Not all hourly associates worked without proper compensation, and the circumstances under which any associate did work “off the clock” or was deprived of premium pay for overtime cannot be established by vague generalizations. Regardless of whether defendant created, as a result of broadly applicable policies, the conditions under which uncompensated or undercompensated work may have been performed and even *858 if constructive knowledge of such activities could be inferred on a class-wide basis, each scenario in which an hourly associate may have been deprived of earned wages would be unique. As a result, defendant’s liability to any aggrieved litigant can only be established by the proof of facts specific to that individual plaintiff. Thus, it cannot be said that the common factual questions predominate over those which affect only individual members of the proposed class.
In this regard, the present case is similar to Evans v City of Johnstown (97 AD2d 1 [3d Dept 1983]). The plaintiffs in Evans, owners of homes and businesses near a sewage treatment plant, sought certification of a class action seeking damages and injunctive relief for injuries allegedly sustained on account of the operation of the plant. In reversing the trial court’s grant of class certification, the Appellate Division held that although there were common factual issues present in the lawsuit, these issues did not predominate over those questions relating to the extent of specific injuries allegedly suffered by each of the individual plaintiffs. As here, “[t]he necessity for such particularized consideration of liability and damages precludes a finding of predominance of common questions of law or fact” (97 AD2d at 3).
3. Typicality
The third prerequisite to class certification, that “the claims or defenses of the representative parties are typical of the claims or defenses of the class” (CPLR 901 [a] [3]), also presents problems in this case. The two remaining nominative plaintiffs are both former hourly associates of defendant’s stores in New York. In their supporting affidavits, both plaintiffs allege instances in which they were required to work “off the clock.” Neither plaintiff, however, makes any claim that he or she ever worked overtime hours without receiving time and one half; neither plaintiff contends that management ever moved overtime hours onto subsequent weeks’ paychecks to avoid paying premium wages; neither plaintiff contends that management ever falsified his or her time records by the insertion of unpaid meal breaks; and neither plaintiff contends that management ever deprived either of them of pay by the insertion of “one-minute punch-outs.” Plaintiffs, through their expert, have expressed an intent to press these four latter claims on behalf of the class, while the nominative plaintiffs themselves do not suggest that they were the victims of this particular alleged conduct of defendant.
*859 Where a nominative plaintiffs claims are not typical of the class, certification of a class action is unavailable (Small v Lorillard Tobacco Co., 94 NY2d 43, 53 [1999]; see also Dimich v Med-Pro, Inc., 34 AD3d 329 [1st Dept 2006]). Here, the named plaintiffs make none of the claims that form the basis of their expert’s opinion that defendant systematically cheated hourly employees through the manipulation of time records — a contention that is central to plaintiffs’ argument that this matter should be certified as a class action. As plaintiffs’ individual claims do not encompass many of those which plaintiffs seek to advance on behalf of the class, it cannot be said that the claims of the representative parties are typical of those of the class.
4. Adequate Representation
The fourth prerequisite to class certification is that “the representative parties will fairly and adequately protect the interest of the class” (CPLR 901 [a] [4]). In analyzing this particular predicate to class certification, a conflict of interest within the class becomes apparent. While both nominative plaintiffs were hourly associates of defendant who exercised no supervisory authority over other employees, the class as defined also includes many assistant managers who were also paid on an hourly basis. These individuals were the day-to-day supervisors of men and women like plaintiffs Bryan Alix and Joyce L. Daniels.
At the heart of plaintiffs’ case is the theory that defendant operates its business with what can best be described as a “split personality.” On the one hand, hourly employees are told at their initial orientation and are reminded orally at meetings and in writing by posted notices in their workplaces that working “off the clock” is strictly forbidden. On the other hand, management is alleged to have routinely encouraged and indeed forced associates to work “off the clock” by assigning work that could not be accomplished in the regular shift, while simultaneously telling associates that they could not work overtime. Indeed, the supporting affidavits of some putative class members state that supervisors often openly praised workers who finished their assigned tasks by “voluntarily” working “off the clock.”
Many of the low-level management employees of defendant, however, are themselves hourly workers. They are thus members of plaintiffs’ proposed class. While these assistant managers were purportedly aggrieved by the same illegal conduct of defendant, many of these same individuals are the *860 very people allegedly to have participated in defendant’s alleged wrongful conduct (or, at the very least, were aware of such conduct).
Moreover, the circumstances under which any hourly assistant manager may have worked “off the clock” might well be fundamentally different from those of the hourly associates. First, of course, is the question of whether or not hourly assistant managers did, in fact, work “off the clock” or whether this phenomenon was limited exclusively to hourly associates. If an hourly assistant manager did work without compensation, she may have done so surreptitiously, perhaps to avoid criticism or to promote her own career advancement. Proving that defendant knew or had reason to know that hourly assistant managers were working without compensation would be far different from proving that defendant created the environment in which hourly associates worked “off the clock” or without overtime pay as part of the ordinary course of business. It is thus unlikely that the nominative plaintiffs can fairly and adequately protect the conflicted interests of this class (see Nissenbaum & Assoc., LLC v Hispanic Media Group USA, Inc., 13 Misc 3d 1216[A], 2006 NY Slip Op 51844[U], *3 [Sup Ct, Nassau County 2006]).
5. Superiority
Finally, plaintiffs must prove that “a class action is superior to other available methods for the fair and efficient adjudication of the controversy” (CPLR 901 [a] [5]). Defendant points out that New York law provides a panoply of administrative remedies that are available to plaintiffs (see Labor Law §§ 101, 196, 196-a, 218, 660, 663). In response, plaintiffs cite to the affirmation of Jerome A. Tracy, Esq., who, in March of 2001, was Chief Counsel of the New York State Department of Labor. This affirmation, filed in an unrelated federal action, states that “the Commissioner of Labor has not sued an employer on a wage claim pursuant to his powers under New York Labor Law § 196 . . . from March 1986 to date.” Plaintiffs rely on this affirmation for their assertion that “[t]here is no administrative remedy available to class members as a matter of right or of practice” (reply mem of law at 43, point 2).
That the Commissioner of Labor may have chosen not to pursue unpaid wage claims via Labor Law § 196 (which requires an assignment of the claim from the employee to the Commissioner as trustee) does not establish that plaintiffs lack an administrative remedy. In fact, Labor Law § 196-a (L 1997, ch 605, § 3, eff Nov. 16, 1997), also known as the Unpaid Wages *861 Prohibition Act (L 1997, eh 605, § 2), empowers a claimant to file, directly with the Commissioner, a complaint for unpaid wages, benefits or wage supplements for prompt administrative action.
Some of the findings of the State Legislature, enacted as part of the Unpaid Wages Prohibition Act, are instructive:
“If our economy is to thrive, the state must pursue enforcement of the wage provisions of the labor law with vigor and fairness. That enforcement is the mandate of the department of labor. The purpose of this legislation, therefore, is to provide the department of labor and working people with stronger and more varied tools with which to collect unpaid wages. The legislature also seeks to ensure that the most vulnerable workers have access to the department’s enforcement mechanisms, in an effort to prevent the generalized devaluation of wages for all workers.” (L 1997, ch 605, § 1 [emphasis added].)
Evidence of the viability of Labor Law § 196-a as an effective enforcement tool for a group of claimants may be gleaned from Matter of Angello v National Fin. Corp. (1 AD3d 850 [3d Dept 2003]). In National Fin., an employer closed a local office of its mortgage brokerage and dismissed the employees of that branch. Thirty-five of those employees filed complaints with the Commissioner of Labor for unpaid wages and benefits. Following an administrative investigation, the Commissioner issued orders directing the employer to pay the claims. As noted by the Appellate Division, since the employer’s records were inadequate, “the amounts in the orders were based almost exclusively on the employees’ sworn claims” (1 AD3d at 850). The awards, with minor exceptions, were all confirmed after CPLR article 78 review (id. at 854).
Several additional aspects of the National Fin. case bear noting. First, many of the claims were for very modest sums of money. One was for an unpaid medical bill of $47; another was for an unpaid bonus of $62 (id. at 853 n 4). In addition, it appears that none of the claimants needed to retain counsel, as the Commissioner proceeded on their behalf at the administrative level, while the Attorney General advocated their positions in the article 78 proceeding challenging the agency’s administrative determinations. Finally, despite an administrative appeal, article 78 review and an appeal of Supreme Court’s dismissal of the petition, less than four years elapsed between the date on *862 which the wages were due and the date on which the administrative award was confirmed by the Appellate Division. Thus, plaintiffs’ contention that there is no administrative remedy available to them in the present case is simply incorrect.
Plaintiffs, however, maintain that in the years that this lawsuit has been pending, neither the Commissioner of Labor nor the Attorney General has brought lawsuits against WalMart on behalf of the putative class members (reply mem of law at 44). While this may be an accurate statement, it proves nothing. Plaintiffs do not assert that they have filed or have attempted to file complaints with any authority other than Supreme Court. Plaintiffs do not even aver that they have informed either the Commissioner of Labor or the Attorney General that they have claims against Wal-Mart for unpaid wages. Thus, the bare assertion that neither the Commissioner nor the Attorney General have sued on behalf of class members is no proof of the lack of an available alternative remedy.
Moreover, plaintiffs’ argument, echoed in the brief filed by the Working Families Party as amicus curiae, that the Commissioner of Labor’s authority to pursue wage violation claims is discretionary does not itself prove the superiority of a class action to an administrative remedy. The Commissioner’s duty to investigate claims, while discretionary under Labor Law § 196 (2), occupies a high priority as noted, supra. Based on the foregoing and in the absence of evidence that plaintiffs have sought unsuccessfully to have their claims addressed through the process afforded them by the Labor Law, plaintiffs have not demonstrated that a class action is superior to a relatively swift, cost-free administrative resolution of their claims.[9]
6. CPLR 902 Factors
Had the prerequisites of CPLR 901 been satisfied, consideration of the additional factors enumerated in CPLR 902 would also have been necessary prior to the certification of a class action (Fleming v Barnwell Nursing Home & Health Facilities, *863 309 AD2d 1132, 1134 [3d Dept 2003]). While this analysis is obviated by plaintiffs’ failure to have established the basic criteria of CPLR 901, a brief examination of some of the CPLR 902 factors further counsels against certifying this matter as a class action.
By way of example, CPLR 902 (4) mandates consideration of “[t]he desirability or undesirability of concentrating the litigation of the claim in the particular forum (emphasis added). A comparison between a trial of a class action in Supreme Court versus an administrative proceeding under the Unpaid Wages Prohibition Act highlights the undesirability of litigation in this forum.
Were this case certified to proceed as a class action, an appeal by defendant of the certification order would be a foregone conclusion. The perfection, argument and determination of that appeal would not only entail an enormous expenditure of resources, it would also consume about a year or more of time. Assuming affirmance of the certification order, the matter could not be placed on a trial calendar until after proper notice to the class had been given, along with a reasonable opportunity for class members to opt out. Whether discovery would have continued through the pendency of the appeal is a separate question that would impact upon the length of time necessary for this case to be ready for trial. Prior to the trial there would in all likelihood be additional litigation over the issue of the admissibility of expert testimony. This would likely result in a lengthy pretrial Frye hearing and possibly more appeals.
No accurate estimate of the length of the trial itself could be made:[10] jury selection would be lengthy, in light of the need to find a panel of qualified and impartial jurors for whom sitting through a long trial would not be an excessive burden; the number of witnesses called could easily exceed 100, judging by the number of individual affidavits submitted by both sides on the certification motion alone; and jury deliberations could be quite extensive. Of course, the burden of proving liability and damages would rest on plaintiffs. Assuming liability were to be found, the calculation of damages might well prove the most difficult of burdens.
*864 Then, at some point in the litigation, a method for distributing damages among the class members would need to be determined (the lack of feasibility of simply dividing damages equally among class members already having been shown supra). This phase of the litigation might call for the appointment of a referee under CPLR article 43 to accomplish the Herculean task of determining the individual entitlements of the hundreds of thousands of class members. Motions to confirm or disaffirm the referee’s report would need to be filed and determined (see CPLR 4320). Of course, after all this, plenary appeals of the final judgment and all intermediate orders would be sure to follow.
On the other hand, claimants could individually or as a group file complaints with the Commissioner of Labor pursuant to Labor Law § 196-a. It is quite possible that the total effort required of the claimants would be limited to the execution of affidavits in support of their claims. The Commissioner of Labor would then undertake an administrative investigation, the length and complexity of which would likely depend on the number and extent of the claims filed. Should the Commissioner find for the claimants, she would issue an order directing payment. A finding of willfulness or repeat violations of the Labor Law could result in the imposition of substantial administrative penalties (Labor Law §§ 196-a, 218 [1]). Appellate review of the Commissioner’s determination would be limited to an administrative proceeding before the Industrial Board of Appeals (Labor Law § 101 [1]). That body’s decision would be subject only to the limited scope of judicial review accorded under CPLR article 78. Further, throughout the process, no claimant would need to have expended any private funds for the prosecution of her claim.
It should be obvious from the above analysis that concentrating the litigation of plaintiffs’ claims in this forum would be undesirable. Continuing this litigation as a class action in Supreme Court will entail a far lengthier proceeding, and it is less likely to result in adequate compensation being paid to those workers who actually may have been deprived of earned wages. Moreover, the social goal of ensuring that workers receive the compensation to which they are entitled can be better advanced in an administrative context where substantial penalties can be imposed on proof of willful conduct, as opposed to class action litigation where entitlement to penalties must be waived as a condition precedent to class certification (see Jacobs v Macy’s E., Inc., 17 AD3d 318 [2d Dept 2005]).
*865 Another factor worthy of consideration is listed at CPLR 902 (5): “The difficulties likely to be encountered in the management of a class action.” Some of the difficulties have already been discussed above; others include: determining the adequacy of notice to the class members, mindful of the constitutional mandate to provide that form of notice reasonably necessary to apprise the interested parties of the litigation (see Mullane v Central Hanover Bank & Trust Co., 339 US 306 [1950]); properly apportioning the considerable anticipated cost of the notice (see CPLR 904 [d]); and supervising voluminous additional pretrial discovery.
In addition to these concerns, and perhaps central to the question of whether a class action trial of this matter could be held at all, is the issue of the admissibility of expert testimony based upon statistical sampling. Should a Frye hearing lead to a finding that the expert opinion evidence sought to be admitted was generally accepted in the scientific community, there would be additional hurdles to overcome before an expert’s opinion could supplant individual testimony. Among these would be the hearsay objection to the admission of evidence based upon unsworn surveys of statistical samplings of class members (see generally, Greene v Xerox Corp., 244 AD2d 877, 877-878 [4th Dept 1997]), as well as the related due process issues already raised by defendant (see generally Matter of Pistone v Sam’s Club, 295 AD2d 875, 876 [3d Dept 2002], citing Matter of Torres v TAD Tech. Servs. Corp., 193 AD2d 975, 975-976 [3d Dept 1993]).
Of course, were it ultimately to be determined that plaintiffs’ expert testimony could not be admitted as a substitute for direct evidence (or that defendant has a right to offer individualized defenses to liability and/or damages), the challenges of conducting the class action trial would go from Herculean to Sisyphean. Due to the individual nature of the factual issues in this case, as detailed, supra, the sheer number of witnesses needed to testify would render the matter completely unmanageable as a class action.
This very situation occurred in the class action brought against defendant in Massachusetts. The trial court had originally granted the plaintiffs’ motion for class certification. The appeals court (Salvas v Wal-Mart Stores, Inc., 04-J-61, June 8, 2004) vacated the class certification and remanded the matter for further proceedings. Following, inter alia, the filing of an amended complaint, the plaintiffs again moved for and obtained *866 class certification. After a Daubert hearing, the trial court determined that the expert testimony offered was not admissible. As a result of this determination, painstakingly analyzed (Polion v Wal-Mart Stores, Inc., 2006 WL 4472492, 2006 Mass Super LEXIS 640 [2006]), the defendant’s motion to decertify the class was granted.
Thus, in light of the likely difficulties to be encountered during the course of this litigation were it to proceed as a class action, certification would be truly an improvident exercise of discretion.
Accordingly, it is ordered that plaintiffs’ motion for certification of this as a class action is, in all respects, denied; and it is further ordered that plaintiffs’ motion for designation as class representatives is denied.

. In addition to the Labor Law violations, plaintiffs had pleaded causes of action sounding in breach of contract and state administrative code violations. As explained more fully infra, these causes of action were dismissed upon defendant’s motion for summary judgment.

. Defendant uses a centralized electronic system to monitor employee time nationwide. Each employee is provided with an identification badge containing a magnetic stripe. At the beginning and end of each shift an employee “swipes” her badge through an electronic reader located at her store. The employee is also required to “swipe” in and out for meal breaks. Prior to February of 2001, employees also “swiped” in and out for rest periods. This latter practice was discontinued, according to defendant, because it was unnecessary since employees are paid during their rest breaks. According to plaintiffs, the practice was discontinued during the pendency of this litigation to thwart discovery. In any event, at present employees only “swipe” in and out at the beginnings and ends of their shifts and meal breaks.
Should an employee not “swipe” in or out for any reason (a badge left at home, a time clock out of order, or a simple lapse of memory), management can override the system and insert a “swipe” ex post facto. While the payroll processing programs will treat an inserted “swipe” in the same manner as any other, computer records still distinguish the employee-generated “swipes” from the management-inserted variety. Much of this litigation nationwide hinges on the question of whether management changed employee time records so that the records would accurately reflect actual time worked or whether management changed employee time records as part of a widespread scheme to cheat workers out of earned wages.

. More precisely, Justice McCarthy had granted summary judgment to the limited extent of directing that an evidentiary hearing be held to determine whether plaintiffs were actually entitled to damages under the minimum wage order causes of action. Prior to that hearing, the parties entered into a stipulation by which they agreed that, under the court’s interpretation of the applicable regulations, the total pay actually received by plaintiffs in any week in which call-in, split or spread shifts had occurred exceeded the total amount of pay to which they would have been entitled had they been earning the minimum wage.

. For example, the analysis performed by plaintiffs’ expert does not encompass all shifts of all employees at all stores for the entire time period relevant to this litigation. As a result, the true total amount of unpaid wages under plaintiffs’ theory would likely be substantially higher than the figures used in the analysis. The problems relative to proving these additional unpaid wages are discussed infra.

. The unavoidable necessity of examining the various claims of putative class members on a case-by-case basis is discussed more fully infra under the rubric of CPLR 901 (a) (2)’s prerequisite of “predominance.” The conclusion therein, that individual issues predominate over common issues, is further supported by the difficulties in defining an ascertainable class of aggrieved *852 individuals (see In re Initial Pub. Offering Sec. Litig., 471 F3d 24, 32 [2d Cir 2006]).

. The seven other appellate courts to have addressed the issue to date (Indiana, Massachusetts, Michigan, North Carolina, Ohio, Texas and Wisconsin) have either affirmed the denials of class certification or have reversed class certifications by their lower courts. Most of these states are similar to New York in that their class action statutes are patterned on Federal Rules of Civil Procedure rule 23. While consideration of similar cases from other states is instructive in certain respects, ultimately this court is bound only by the decisions of New York appellate courts and must independently examine the facts, claims and defenses presented and make its own discretionary determinations (see Iliadis v Wal-Mart Stores, Inc., 191 NJ 88, 922 A2d 710 [2007]).

. Plaintiffs do cite to a criminal case (People v Hough, 297 AD2d 575 [2d Dept 2002]) for the proposition that expert testimony based upon statistical sampling may be admissible under certain circumstances at a trial. In Hough, the defendant was convicted of criminal possession of a controlled substance in the third and fourth degrees based upon a laboratory analysis of drugs where that analysis involved a statistical sampling of the substance in question. While the Court of Appeals has approved such a methodology for analyzing illegal drugs seized in the course of a criminal investigation (People v Argro, 37 NY2d 929 [1975]), it is not akin to the methodology alluded to by plaintiffs in their papers. It may be reasonable to infer that, when numerous random samples of a cache of drugs all test positive for cocaine, the entire quantity of the substance seized is cocaine. It may not be reasonable, however, to infer that, if a certain percentage of witnesses testify that they were required to work “off the clock” for Wal-Mart, that same percentage of the total number of hourly employees of Wal-Mart were forced to work “off the clock.”

. Nor do the time records demonstrate that defendant either knew or had reason to know that its employees were engaged in “off the clock” work.

. The amicus curiae cites statistics, studies and articles in support of its contention that the advocacy of workers’ complaints at the administrative level in both New York State and in the federal system has consistently declined over recent years. What is lacking in the record of this case, however, is any evidence whatsoever that hourly employees of Wal-Mart have brought their grievances regarding “off the clock” work, unpaid overtime or falsified time records to any administrative agency, state or federal. Absent proof that these complaints were presented and rejected by the very bodies whose mandate is the investigation and resolution of such claims, plaintiffs’ position that a class action is superior to an administrative remedy is baseless.

. The class action trial recently held in California lasted four months (Savaglio v Wal-Mart Stores, Inc., 2006 WL 3626295 [Cal Super Ct 2006] [As there was no opportunity for interlocutory appellate review of the trial court’s class action certification order, the question of the propriety of having certified that matter as a class action must await the determination of the plenary appeal]).